

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-25-00160-CV

———————————————————

ANQUISHA WILLIAMS, INDIVIDUALLY AND ON BEHALF OF HER MINOR SON, D.T., DECEASED, Appellant

V.

HURRICANE HARBOR, LP; HURRICANE HARBOR, GP, LLC; SIX FLAGS THEME PARKS, INC.; AND SIX FLAGS ENTERTAINMENT CORPORATION, Appellees

On Appeal from the 67th District Court
Tarrant County, Texas
Trial Court No. 067-326998-21

Before Kerr, Bassel, and Walker, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I. Introduction

In four issues, Appellant Anquisha Williams—individually and on behalf of her minor son, D.T., deceased—challenges a take-nothing judgment for the claims that she made against Appellees Hurricane Harbor, LP; Hurricane Harbor, GP, LLC; Six Flags Theme Parks, Inc.; and Six Flags Entertainment Corporation.

Only the liability of Hurricane Harbor, LP and Six Flags Entertainment Corporation was submitted to the jury. The trial court's judgment recited that Hurricane Harbor GP, LLC and Six Flags Theme Parks, Inc. were dismissed by directed verdict, and Williams raises no challenge to that ruling on appeal. Hurricane Harbor, LP operates a waterpark in Arlington, Texas. It is located in close proximity to another theme park in Arlington—Six Flags Over Texas. Six Flags Entertainment Corporation owns both parks. For clarity, we will refer to Hurricane Harbor, LP and its physical premises—the waterpark at issue—as Hurricane Harbor or the Park. We will refer to the physical premises of Six Flags Over Texas as Six Flags.

The tragedy that underlies Williams's claims is the death of her son D.T. in the Park's parking lot when he was struck by a bullet fired by a Park patron. The take-nothing judgment followed a two-week jury trial, at the conclusion of which the jury found no liability on the part of Hurricane Harbor and Six Flags Entertainment Corporation.

Williams does not attack the sufficiency of the evidence supporting the jury's no-liability finding. Instead, in four issues she challenges the trial court's rulings both with respect to what evidence it excluded and some of the questions and the instructions that it included in the jury charge. We overrule Williams's issues for the following reasons:

- In her first issue, Williams contends that the trial court erred by refusing to admit—with one exception—evidence of other crimes that she contends made the crime committed against D.T. foreseeable. We overrule this issue because

   o the trial court had the discretion to determine which crimes were admissible under the *Timberwalk*[1] factors that guide whether a prior crime makes a subsequent crime foreseeable to a premises owner;

   o several reasons support the trial court's discretion to deny admissibility of crimes that occurred off the Appellees' premises, including that such crimes swept too large an area, that there was a lack of publicity of these crimes, that there was a lack of similarity of the more than one hundred crimes that Williams sought to introduce and the crime at issue, and that Williams had adopted a similarity criteria that was too broad; and

   o for crimes that had occurred on the premises, Williams impliedly acknowledges that many of the more than thirty crimes that she sought to introduce were not sufficiently similar to the occurrence at issue to support their admissibility. We will examine those that she appears to argue were admissible and conclude that most of them lack the necessary similarity. For the remaining three, Williams offers no argument that the trial court's failure to exclude them was harmful.

- In her second and third issues, Williams argues that the trial court erred in formulating the jury charge. We reject these issues because

---

[1]*Timberwalk Apartments, Partners, Inc. v. Cain*, 972 S.W.2d 749, 753 (Tex. 1998).

3

- o the issue of new and independent cause was raised by the evidence;

- o an instruction stating that the person who had shot D.T. had been charged with murder did not exaggerate that fact to the extent that it was harmful; and

- o submission of a question inquiring about the shooter's negligence was not material and thus was not harmful because the jury found no liability as to the entities that were included in the charge.

- In her fourth issue, Williams asserts that the trial court erred by refusing to admit evidence of gross negligence. We reject this issue because

- o Williams failed to plead a claim that would permit her to recover exemplary damages when the harm to D.T. resulted from a criminal act;

- o Williams waived a recovery for exemplary damages by failing to submit a proposed jury question on the theory that would support the recovery;

- o Williams failed to establish that the trial court erred by refusing to admit the exhibits that she claims in her opening brief should have been admitted; and

- o Williams's reply-brief argument that other exhibits should have been admitted fails because she did not include those in her offer of proof and shifts the burden to us to correlate the exhibits to her admissibility standard—a burden that we will not shoulder.

## II. Factual and procedural background

### A. The tragic event, the issues tried, and the trial outcome

Like many tragedies, the facts below occurred within a very short time frame, and few facts are certain. We know that D.T. passed through the exit gate of Hurricane Harbor at 6:56:58 p.m. on June 23, 2021, as the Park was closing. We

4

know that a bullet fired by Cameron Stephens struck D.T. a few seconds after 7:03 p.m. and that the bullet tragically ended his life at the age of sixteen. But little else was established with certainty during the two-week trial of the premises-liability lawsuit that Williams brought to determine whether Appellees' negligence caused D.T.'s death.

As with any well-tried case, the parties clashed on a host of issues, including (1) what triggered the altercation that led to Stephens's firing a gun and how long the altercation lasted; (2) how the Park's security personnel—including an Arlington police officer the Park paid—were trained, positioned, and reacted to events; (3) whether the policies and security staffing of the Park's parking lot met an appropriate standard of care—with both sides offering expert testimony on the subject and the testimony conflicting among witnesses knowledgeable of the Park's actions about measures that were actually taken to address parking-lot security; and (4) whether the events leading up to D.T.'s death were foreseeable by the Park, with Williams seeking to offer evidence of over 150 "violent" crimes that had occurred on the premises of the Park and Six Flags or within a one-mile radius of those parks and the trial court excluding evidence of all those crimes except one. Williams also attempted to assert an exemplary-damages claim, which the trial court did not permit her to pursue.

Ultimately, in a nonunanimous verdict, the jury concluded that neither Hurricane Harbor nor Six Flags Entertainment Corporation was negligent but that Stephens was. The jury assigned no responsibility for the occurrence to Hurricane

5

Harbor or to Six Flags Entertainment Corporation and allocated 100% of the responsibility to Stephens. Williams does not raise a sufficiency challenge to the jury's findings but instead challenges the exclusion of evidence and the structure of the court's charge as we outlined in the introduction. Though Williams does not bring a sufficiency challenge, we detail the facts and expert opinions presented at trial to give context to the issues presented.

### B.      The physical setting of Hurricane Harbor

The following aerial photo of the Park with a black rectangle shows the exit gate D.T. used and the location where he was shot:



The following photo is from a police report; it is an enlargement of the Park's entrance and exit gates and shows the location where D.T.'s body fell:



To give further perspective, the following is a video-surveillance screenshot showing the Park's exit gate minutes before D.T. was shot:



The Arlington police officer that the Park paid and to whom we repeatedly refer was standing behind the fence on the far left of the picture, and D.T. collapsed under the trees in the picture's far right.

### C. The parties' themes

Williams's theme was that Hurricane Harbor knew that Park patrons had firearms in their parked cars. Patrons were screened for weapons when they passed through the Park's entrance gates, but when found to be carrying a firearm, they were instructed to put the weapon in their vehicle before entering the Park. Williams contended that security measures should have been in place to prevent altercations from occurring in the parking lot before any firearms that might be in a vehicle could come into play.

Hurricane Harbor's basic theme was that it had taken reasonable security measures. D.T.'s death, in Hurricane Harbor's view, was caused—not by any security failings—but by Stephens's criminal act, and such act could not have been reasonably foreseen.

### D. The altercation

The altercation that triggered D.T.'s shooting occurred in an area of the Park's parking lot that was at most "fifty meters" (per the police officer) in front of the exit gate. Other testimony placed it "right by the front gate."

The Park's exit-gate surveillance camera established the time frame of D.T.'s shooting. Though Stephens is not shown in the period of the exit camera's recording

8

introduced at trial, he had also been a Park patron, had exited upon the Park's closing, and then had remained in the parking lot for approximately five to ten minutes before the altercation began.

In the period between D.T.'s exit and his shooting, a fight broke out between two groups—in one of which D.T. was a member, and in one of which Stephens was a member—and lasted for an unknown period of time. One of Williams's experts described the escalating scenario as follows: "There was an altercation. Someone was knocked to the ground. That individual fled back to a vehicle and produced a weapon, approached the group, and started firing indiscriminately into the crowd."[2]

---

[2]The following statement that recounted the events is contained in an Arlington Police Department report:

[The witness] stated that he arrived at Hurricane Harbor between 1500–1600 hours on 06/23/2021 and remained there until close. He stated that he did not have any interaction with the suspect/suspect[']s associates while inside Hurricane Harbor. At the point when [the witness] and the rest of the involved individuals were outside the [P]ark is when the suspect approached the group. The suspect apparently said, "[Y]'all [J]ohn or 2200[?"] The suspect proceeded to walk towards [another person in D.T.'s group], striking him in the face. Two other unknown suspects came from between cars to assist the suspect[,] and a large fight began. At some point in time[,] the suspect is viewed by [the witness] running toward and [sic] dark[-]color[ed] vehicle and retriev[ing] a firearm, at which point everyone involved in the fight began to flee on foot. The suspect began firing shots as he was heading towards the [witness] and his friends [were] running away.

[The witness] saw the victim begin to stumble and seek cover behind a tree as he was struck by gunfire. [The witness] said that he heard three gunshots.

9

Other witnesses portrayed a more quickly escalating situation. The exit-camera footage shows patrons leaving the Park while Park personnel and an on-scene Arlington police officer reacted to a disturbance during the fifteen to twenty seconds before D.T. entered the frame and collapsed after being shot. A security staff member at the exit gate described the event as happening fast, though he did not know how long the fight that precipitated the shooting had been going on. The Arlington police officer described hearing honking car horns "right in front of [him] by the front gate" and then seeing a group of young people jump out of cars and start fighting. The officer testified that "within a couple of seconds" of the physical altercation's beginning, he moved to address it. As he was walking toward the altercation, he heard a gunshot and said that "[t]here was no time to basically react to stop it."

Nonparty witnesses described seeing a fight as they walked to their cars near the gate. A few seconds after seeing the fight, a shot was fired. Though they did not see the fight break out, the witnesses described the events as happening in less than a minute.

### E. The clash of testimony about Hurricane Harbor's security measures

The trial's temporal focus was the security that was located at the Park's exit gate as the Park closed, and the proximal focus was the security at the exit gate and the parking lot. Again, the central theme of Williams's criticisms was that Hurricane

10

Harbor had failed to properly address the fact that Park patrons might have firearms in their vehicles and should have formulated security policies to deescalate altercations before those firearms could become involved.

Williams emphasized that Hurricane Harbor had signs stating that firearms and weapons were not allowed on the property. But even Williams's experts agreed that patrons' vehicles could not be searched when entering the Park's parking lot and that the Park's patrons, including Stephens, were legally entitled to possess a firearm under Texas law. As noted above, patrons who entered the Park from the parking lot through its front gate were screened for weapons; when a patron was found to possess a gun, Park security personnel involved the on-scene Arlington police officer and, with his or her assistance, gave the instruction to take any "weapon" back to the patron's vehicle.

Williams cataloged several alleged deficiencies in Hurricane Harbor's security measures. These included (1) the young age of its security personnel; (2) the failure of clothing worn by security personnel to identify them as such; (3) the positioning of the Arlington police officer at the exit gate and specifically whether his positioning was an adequate deterrent to bad actors and gave him an adequate view of the parking lot; (4) the lack of visible security in the parking lot that would be a deterrent and whether Hurricane Harbor should have paid the additional cost to put such security in place; (5) the failure to replace another Arlington police officer who had been working at the Park on the day of the shooting but had to leave early because of a family

11

emergency; (6) the absence of cameras' monitoring patrons' behaviors and the fact that the one camera monitoring the parking lot was broken on the day of D.T.'s shooting; and (7) the inefficacy of parking an Arlington police cruiser near the Park's gates and whether that cruiser was present on the day of the shooting.

The overlay of Williams's attacks on the Park's security measures was whether its parking lot was actually patrolled. A primary trigger for this controversy was testimony of the Six Flags security manager who also had responsibility for Hurricane Harbor; he testified that security personnel were pulled from the parking lot forty-five minutes before the Park closed and that a security truck was not present on the day of the incident. The security manager at one point testified that there was "no security" in the parking lot and that security personnel "responded" to incidents in the lot as they arose. But both the security manager and other witnesses also testified that there was proactive security in the parking lot. The jury heard from a variety of witnesses about measures in the parking lot. Hurricane Harbor employees mentioned foot, bike, and golf-cart patrols. Another witness testified about the golf-cart patrols and also a truck used to patrol the lot. The on-scene Arlington police officer testified about security measures that he saw occur in the lot. Another security staff member testified that he had patrolled the lot in a security truck fifteen minutes before the shooting. An expert called by Williams acknowledged the testimony about security measures in the parking lot.

12

## F.    Evidence of other crimes

Williams sought to admit evidence of prior crimes, arguing that they were evidence that made D.T.'s shooting foreseeable.  Specifically, she offered evidence of approximately 120 crimes involving "serious felonies and crimes involving gun and deadly weapon use" occurring within a one-mile radius but off the premises of the Park and Six Flags.  She also offered evidence of thirty-five crimes of an alleged similar nature that had occurred during a one-year time frame on the Hurricane Harbor and Six Flags premises.

The trial court conducted a multi-hour hearing during which it reviewed each of Williams's proposed exhibits detailing the prior crimes.  After this review, the trial court denied admission of the prior crimes, with one exception:  the trial court admitted evidence of a shooting event that had occurred near the entrance of Six Flags's parking lot in March 2021, which was a couple of months before D.T.'s death.

## G.    Experts

The jury heard conflicting opinions from experts.  For example, one of Williams's experts criticized the lack of patrols in the Park's parking lot and the failure to adequately monitor the lot and noted that Hurricane Harbor did not train its

13

personnel to keep guns off its "entire property."[3] The expert testified that security should be focused on the parking lot at closing time:

> Generally speaking, in the security field and the police field, issues are more prone at the conclusion of a situation at the end of -- at the end of an event at the closing of a bar or a nightclub. Issues are very prone to occur in the parking lot. And parking lots are the places where the implements of crime are kept. They're not generally taken into events, but they're kept in the cars for easy access. And I'm talking guns, narcotics, and issues like that.
>
> And that's what you have to plan for. You know they're there. Fundamentally, it's a challenge to the security process. But you array your force. You train your force. You position your force to deal with it to the best of your ability.

Because vehicles were not searched for weapons, the expert reiterated that parking-lot surveillance should be constant but more focused on the time of the Park's closing because "[m]ost shootings, in my personal experience, most events like this occur in and around closing, and they involve a parking lot." This expert opined that four armed police officers would have been a "functional staffing level" at Hurricane Harbor.

Williams's second expert also focused on Hurricane Harbor's alleged security failures in the parking lot:

> Q. Do you believe -- or do you have an opinion as to whether Six Flags and Hurricane Harbor on June 23[], 2021[,] met the standard in the industry as far as egress from the [P]ark to ensure that they -- a patron made it to [his or her] car safely?

---

[3]As the expert later conceded, "[I]t was legal in June of 2021 for anybody to drive onto the premises of Hurricane Harbor and have a concealed handgun [in his or her vehicle]."

14

A. As it relates to exiting the interior of the . . . [P]ark and into the parking lot, no. There was no egress officer to ensure that the -- the guests got out to the parking lot, exited their property in a safe manner.

Q. Did you see any efforts by Hurricane Harbor to ensure that the patrons left the interior of the gate and made it safely to their vehicles in the Hurricane Harbor parking lot?

A. No, sir.

Williams's second expert opined that there should have been "a minimum of four police officers" patrolling the parking lot.

In contrast, Hurricane Harbor's expert testified that its security measures were adequate.

The experts also clashed regarding whether the shooting was foreseeable. One of Williams's experts opined that the prior shooting incident that had occurred in the vicinity of Six Flags's parking lot in March 2021 made the later event of D.T.'s shooting foreseeable. He also opined that the event was foreseeable because an employee of Hurricane Harbor had allegedly witnessed the altercation leading to the shooting. Further, he opined that the event was foreseeable when Hurricane Harbor had "appreciated the danger of the crime that was occurring on the property because they [had] hired off-duty police" and had posted signs prohibiting weapons on the property.

In counter to Willliams's experts' opinions, Hurricane Harbor's expert testified that Stephens had failed to exercise ordinary care and was negligent. Further, Hurricane Harbor's expert opined that Stephens had caused D.T.'s death, that D.T.'s

15

murder in Hurricane Harbor's parking lot was not foreseeable, and that Stephens's act was a new and independent cause because he was "the instigator of that particular event."

### H.    The jury charge and the jury's answers to its questions

As noted, the jury found in favor of Hurricane Harbor and Six Flags Entertainment Corporation. In response to the charge's first three questions, the jury found that neither entity was negligent, that Stephens was negligent, and that Stephens was 100% responsible for the occurrence. Williams objected to certain aspects of the charge at trial and carries those objections forward on appeal. First, she objected to an instruction—one that noted that Stephens had been charged with murder and that included the elements of the offense—because it was a comment on the weight of the evidence. Williams also objected to submitting a question on whether Stephens's acts constituted negligence because his acts were intentional. She further objected to the charge's new and independent cause instruction because there was "no evidence of a new and independent cause that was not foreseeable."

### I.    Judgment and postjudgment proceedings

The trial court signed a final judgment decreeing that Williams—both individually and on behalf of D.T.—take nothing. Williams filed a new-trial motion, which was denied by written order. Williams then filed a notice of appeal.

16

## III. Analysis

### A.    Williams's first issue

In her first issue, Williams asserts generally that "[t]he trial court abused its discretion by excluding evidence of past violent crimes at[] and near[] Hurricane Harbor because those other crimes form the basis of duty, breach, and causation in *Timberwalk*[4] premises[-]liability cases." We reject this contention.

### 1.    We explain the nature of Williams's claim and the general principles that govern it.

The trial court submitted a negligence claim to the jury. Negligence requires proof of three elements: a legal duty owed by one person to another, a breach of that duty, and damages proximately caused by the breach. *See, e.g.*, *D. Hous., Inc. v. Love*, 92 S.W.3d 450, 454 (Tex. 2002). The claim that Williams submitted sounds in premises liability rather than general negligence. The distinction between the two arises from the nature of the activity that Williams claims caused D.T.'s death. The Texas Supreme Court has highlighted the distinction between a negligent activity and a premises-liability claim as follows:

> In a negligent-activity case, a property owner or occupier must "do what a person of ordinary prudence in the same or similar circumstances would have . . . done," whereas a property owner or occupier in a premises[-]liability case must "use ordinary care to reduce or eliminate an unreasonable risk of harm created by a premises condition which the owner or occupier [of land] knows about or in the exercise of ordinary care should know about."

---

[4]972 S.W.2d at 753.

*United Scaffolding, Inc. v. Levine*, 537 S.W.3d 463, 471 (Tex. 2017) (quoting *Timberwalk*, 972 S.W.2d at 753). The claims are distinguished by the principle that "negligent activity encompasses a malfeasance theory based on affirmative, contemporaneous conduct by the owner that caused the injury, while premises liability encompasses a nonfeasance theory based on the owner's failure to take measures to make the property safe." *Id.* (quoting *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 776 (Tex. 2010)). "A complaint that a landowner failed to provide adequate security against criminal conduct is ordinarily a premises[-]liability claim." *Timberwalk*, 972 S.W.2d at 753.

And "[g]enerally, property owners have no legal duty to protect persons from third-party criminal acts." *UDR Tex. Props., L.P. v. Petrie*, 517 S.W.3d 98, 100 (Tex. 2017). "But a property owner who 'controls the premises does have a duty to use ordinary care to protect invitees from criminal acts of third parties if he knows or has reason to know of an unreasonable and foreseeable risk of harm to the invitee.'" *Id.* (quoting *Lefmark Mgmt. Co. v. Old*, 946 S.W.2d 52, 53 (Tex. 1997)). An "invitee" is one on the premises of another with the owner's knowledge or consent and for the purpose of engaging in an undertaking for the mutual benefit of both. *Catholic Diocese of El Paso v. Porter*, 622 S.W.3d 824, 829 (Tex. 2021).

The supreme court has provided four guiding factors on the question of the foreseeability of criminal conduct:

First, proximity: "For a landowner to foresee criminal conduct on property, there must be evidence that other crimes have occurred on the property or in its immediate vicinity." Second, recency and frequency: "Foreseeability also depends on how recently and how often criminal conduct has occurred in the past." Third, similarity: "The previous crimes must be sufficiently similar to the crime in question as to place the landowner on notice of the specific danger." And fourth, publicity: "The publicity surrounding the previous crimes helps determine whether a landowner knew or should have known of a foreseeable danger. . . . These factors—proximity, recency, frequency, similarity, and publicity— must be considered together in determining whether criminal conduct was foreseeable."

*UDR Tex. Props.*, 517 S.W.3d at 101–02 (citations omitted) (quoting *Timberwalk*, 972 S.W.2d at 757–59).

Once foreseeability has been established, "the parameters of the duty must still be determined." *Id.* at 101. Courts determine the duty's parameters by

consider[ing] "the social utility of the actor's conduct, the consequences of imposing the burden on the actor, and any other relevant competing individual and social interests implicated by the facts of the case." *Tex. Home Mgmt., Inc. v. Peavy*, 89 S.W.3d 30, 33 (Tex. 2002). These considerations take into account not just the "reasonable foreseeability of harm to the person injured" but also "public[-]policy considerations."

*Id.* The question of foreseeability embraced by the *Timberwalk* factors requires a base determination of the risk's reasonableness; "[a] risk is unreasonable when the risk of a foreseeable crime outweighs the burden placed on property owners—and society at large—to prevent the risk." *Id.* at 103.

The question of duty is generally a legal one. *Trammell Crow Cent. Tex., Ltd. v. Gutierrez*, 267 S.W.3d 9, 12 (Tex. 2008); *Timberwalk*, 972 S.W.2d at 756; *see also Park v. Exxon Mobil Corp.*, 429 S.W.3d 142, 145–48 (Tex. App.—Dallas 2014, pet. denied)

19

(discussing *Trammell Crow* and *Timberwalk* and applying factors). However, the question may become one of fact when there is disputed proof that prior criminal activity makes the crime in question foreseeable. *See, e.g., Pagayon v. Exxon Mobil Corp.*, 536 S.W.3d 499, 500, 504 (Tex. 2017) ("We recognized that some of these factors— risk and foreseeability are obvious examples—['] may turn on facts that cannot be determined as a matter of law and must instead be resolved by the factfinder[,'] but we noted that such cases are unusual.").

> **2.** **We set forth the standard of review for the admissibility of evidence.**

The general standard of review for the admission or exclusion of evidence is as follows:

> Rulings on the admission or exclusion of evidence are committed to the trial court's sound discretion. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995). A trial court abuses its discretion if it rules without regard for any guiding rules or principles. *Id.* We uphold the district court's evidentiary ruling if there is any legitimate basis for the ruling. *Owens–Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998). In other words, a trial court does not abuse its discretion in admitting or excluding evidence if it reaches the right result for the wrong reason. *Donalson v. Barr*, 86 S.W.3d 718, 720 (Tex. App.—Houston [1st Dist.] 2002, [order]); *Luxenberg v. Marshall*, 835 S.W.2d 136, 141–42 (Tex. App.—Dallas 1992, [orig. proceeding]). Furthermore, for the exclusion of evidence to constitute reversible error, the complaining party must show[] (1) that the trial court committed error; and (2) that the error was reasonably calculated to cause and probably did cause rendition of an improper judgment. *McCraw v. Maris*, 828 S.W.2d 756, 757 (Tex. 1992).

*Beck v. Law Offs. of Edwin J. (Ted) Terry Jr., P.C.*, 284 S.W.3d 416, 442 (Tex. App.—Austin 2009, no pet.).

**3.    We reject Williams's argument that the trial court had no role as a gatekeeper to determine whether the prior crimes she relied on to establish foreseeability were admissible.**

Williams argues as follows to support her proposition that the trial court lacked a gatekeeper role:

> First, *Timberwalk* is not an admissibility standard; it is a multi-factor test for determining when the prevalence of past crime makes future crime foreseeable. However, in ruling on admissibility of the evidence, the trial court stated that it placed particular emphasis on the *Trammell Crow* and the *Park* cases. But neither *Trammell Crow* nor *Park* discusses the admissibility of evidence. [Record reference omitted.]

Williams's position that the trial court has no discretion to decide which crimes meet the *Timberwalk* standard cannot be generalized from *Trammell Crow* and *Park* because those opinions did not discuss admissibility. Thus, we are unsure exactly what Williams is arguing. If she is arguing that the trial court has no discretion to decide whether the other crimes met the necessary standards and was compelled to accept her sorting, we reject that argument because it is unreasonable and contrary to precedent.

First, in rejection of Williams's basic premise, *Trammell Crow* was an appeal from a jury verdict, and *Park* was from a summary judgment. *See Trammell Crow*, 267 S.W.3d at 12; *Park*, 429 S.W.3d at 144. The question of what crimes were admissible to establish foreseeability was not before these courts.[5]

---

[5]Williams's reply brief makes this very point by noting, "In fact, in each of the cases in Hurricane Harbor's brief, the evidence of other crimes had already been admitted when the court considered it in light of *Timberwalk*'s foreseeability factors."

Second, in contexts analogous to whether other crimes establish foreseeability, courts have recognized that the trial court has a gatekeeper role in determining admissibility. For example, in deciding whether evidence of a similar accident is admissible in a negligence case, the Fourteenth Court of Appeals noted the predicate that must be met to support the admission of other accidents:

> We begin by observing that evidence of other accidents, near accidents, or related similar events is probative evidence in Texas courts, provided an adequate predicate is established. *See In re HEB Grocery Co.*, 375 S.W.3d [497,] 502–03[ (Tex. App.—Houston [14th Dist.] 2012, orig. proceeding)]; *Henry v. Mrs. Baird's Bakeries*, 475 S.W.2d 288, 294 (Tex. . . . App.—Fort Worth 1971, writ ref'd n.r.e.). Insofar as admissibility is concerned, evidence of similar events need not be identical to the case at hand, but the circumstances must be reasonably similar. *See Mo. Pac. R.[R.] Co. v. Cooper*, 563 S.W.2d 233, 236 (Tex. 1978); *McEwen v. Wal-Mart Stores, Inc.*, 975 S.W.2d 25, 29 (Tex. App.—San Antonio 1998, pet. denied). Prior to admission of similar events, the plaintiff must first establish (1) a predicate of similar or reasonably similar conditions; (2) connection of the conditions in some special way; or (3) that the incidents occurred by means of the same instrumentality. *Id.*; *Henry*, 475 S.W.2d at 294; *Columbia Med. Ctr. Subsidiary, L.P. v. Meier*, 198 S.W.3d 408, 411–12 (Tex. App.—Dallas 2006, pet. denied) ("An unrelated incident may be relevant and admissible if it and the incident involved in the lawsuit occurred under reasonably similar circumstances, the two incidents are connected in a special way, or the incidents occurred by means of the same instrumentality."). "'Reasonably similar' generally means the same type of occurrence." *Columbia Med[.] C[tr.]*, 198 S.W.3d at 411–12. The degree of similarity required depends on the issue the evidence is offered to prove. *Nissan Motor Co. . . . v. Armstrong*, 145 S.W.3d 131, 138 (Tex. 2004).

*In re Sun Coast Res., Inc.*, 562 S.W.3d 138, 148 (Tex. App.—Houston [14th Dist.] 2018, orig. proceeding); *see also In re Reyna*, No. 13-24-00158-CV, 2024 WL 3943451, at *6 (Tex. App.—Corpus Christi–Edinburg Aug. 26, 2024, orig. proceeding) (same);

22

*Arreola v. Union Pac. R.R.*, 657 S.W.3d 789, 822–23 (Tex. App.—El Paso 2022, no pet.) (same).

Indeed, *Sun Coast* cited the supreme court's opinion in *Nissan Motor*, which noted what a trial court must consider on the question of whether other accidents are admissible:

> We do not attempt here to categorize every instance when other accidents are admissible or every occasion when they are not. But in exercising discretion regarding admissibility, trial courts must carefully consider the bounds of similarity, prejudice, confusion, and sequence before admitting evidence of other accidents involving a product.

*Nissan Motor*, 145 S.W.3d at 139; *see also Kia Motors Corp. v. Ruiz*, 432 S.W.3d 865, 881–84 (Tex. 2014) (holding that the trial court committed harmful error when it improperly admitted dissimilar warranty claims).

Third, in dealing with a *Timberwalk* analysis, though in a summary-judgment context, the San Antonio Court of Appeals held that the first task of a court when examining the question of foreseeability is to "narrow" the criminal history that applies to the foreseeability analysis. *See Flanagan v. RBD San Antonio L.P.*, Nos. 04-16-00761-CV, 04-16-00768-CV, 2017 WL 5615567, at *3 (Tex. App.—San Antonio Nov. 22, 2017, pet. denied) (quoting *Jenkins v. C.R.E.S. Mgmt., L.L.C.*, 811 F.3d 753, 756 (5th Cir. 2016)). As *Flanagan* explained, "[C]ourts then compare that narrowed criminal history with the crime in question based on the five *Timberwalk* factors: proximity, publicity, recency, frequency, and similarity." *Id.* (inner quotation marks omitted) (quoting *Jenkins*, 811 F.3d at 756 (citing *Timberwalk*, 972 S.W.2d at 759)).

Thus, though not directly answering the question posed by Williams, *Flanagan* demonstrates that the trial court is not without the power to screen the evidence offered on the foreseeability question.

We see no reason why the trial court below did not hold similar discretion in deciding which of the 154 other crimes that Williams sought to admit were admissible under the *Timberwalk* factors. Otherwise, a plaintiff would have unfettered leeway to decide what crimes arguably were relevant to the question of foreseeability, leaving the trial court no discretion to decide initial questions of admissibility or to control the administration of the trial. Instead, a party could simply bundle whatever crimes it argued were relevant to the *Timberwalk* analysis and leave the trial court with no control other than to watch the protracted battle as a defendant must challenge the application of crimes that would constitute no evidence of foreseeability on appeal.

> **4.** **We conclude that the trial court did not err by excluding evidence of crimes that occurred outside the premises of Hurricane Harbor or Six Flags.**

We conclude that our analysis is more efficient by examining the prior crimes that Williams sought to introduce in separate groups—those occurring on the premises of Hurricane Harbor and Six Flags and those occurring off premises but within a one-mile radius of those premises. We first hold that the trial court did not abuse its discretion by excluding evidence of the off-premises crimes en masse. Two rationales support that overall decision—a lack of proximity and a lack of publicity. Even if those rationales fail, Williams's briefing defends only a subset of the off-

24

premises crimes that she sought to introduce as being sufficiently similar to the crime against D.T., and the criteria that she uses to create that subset is still too broad.

Accepting that the trial court had different blanket bases to exclude the off-premises crimes also undermines Williams's argument that the trial court abused its discretion by requiring each crime to meet all five *Timberwalk* factors. If there were a basis for the trial court to exclude the off-premises crimes en masse or by reason of the fact that individual crimes within that category are not probative, whether the trial court subjectively imposed that standard becomes at most a hypothetical error.

> **a. The trial court properly excluded evidence of off-premises crimes because they were not sufficiently proximate to Hurricane Harbor's premises.**

The lion's share of the crimes that Williams sought to admit—approximately 120 of the 154 crimes that she offered—did not occur on the premises of either Hurricane Harbor or Six Flags. Instead, they occurred within a one-mile radius of Hurricane Harbor. Williams offers only a citation to cases that allowed the admission of crimes within such a one-mile radius. Hurricane Harbor counters with cases rejecting a radius of such reach and noting the unique circumstances that may cause crimes occurring off premises to lack probative value. We agree with Hurricane Harbor that the principle it cites supported the trial court's exercise of its discretion to exclude evidence of the off-premises crimes.

Williams sought to admit a raft of crimes that had occurred within a one-mile radius of Hurricane Harbor under the rubric that they involved "violent" crimes.

25

Under this rubric, Williams bundled a variety of crimes that included domestic disputes, sexual assaults, robberies, and other types of assault. But as Hurricane Harbor points out, its premises are uniquely situated because it has hard boundaries that inhibit the migration of crime from outside its premises:

> Hurricane Harbor is a special[-]use facility bordered by fencing and a multi-lane highway, which create a visible buffer zone around the [P]ark and make it less likely that any foot traffic—or off-premises crime—will migrate to the [P]ark. By way of illustration, the excluded exhibits include 29 robberies that took place in the one-mile radius surrounding Hurricane Harbor. As an opportunistic and economically motivated crime, robbery might be the most likely crime to spill over into surrounding areas. But in that same time frame, not a single robbery was reported at Hurricane Harbor. [Footnotes omitted.]

Williams never confronts how this unique feature of Hurricane Harbor impacts the relevance of crimes that occurred outside its premises. Instead, in her opening brief, she offers one paragraph acknowledging that "[t]he relevant geographic area differs from case to case" with "[c]ourts look[ing] to proximities . . . ranging from the subject property itself to a one-mile radius from that property."[6] In her reply brief, Williams asserts that the jury was not permitted to hear about crimes in the "geographic proximity" without responding to Hurricane Harbor's argument regarding why crimes

---

[6]For example, Williams cites opinions accepting a one-mile radius. *See Timberwalk*, 972 S.W.2d at 759; *Watanabe v. Summit Path Partners, LLC*, 650 S.W.3d 112, 129 (Tex. App.—Houston [1st Dist.] 2021, no pet.); *Park*, 429 S.W.3d at 147 (one-mile radius but citing lack of evidence of appellee's knowledge of other crimes). She also cites cases discussing crimes within an unspecified immediate vicinity. *See Mellon Mortg. Co. v. Holder*, 5 S.W.3d 654, 657 (Tex. 1999) (discussing 190 violent crimes "near the garage"); *Nguyen v. SXSW Holdings, Inc.*, 580 S.W.3d 774, 786–88 (Tex. App.—Houston [14th Dist.] 2019, pet. denied) (reviewing crimes "in or near downtown Austin").

outside its premises had no bearing on the foreseeability of crime within its (or Six Flags's) premises.

The San Antonio Court of Appeals specifically dealt with the proximity question and how far it should extend beyond the premises where a crime occurred by analyzing the supreme court's holdings in *Trammell Crow*.

> In *Trammel[l] Crow . . .* , the Texas Supreme Court stated, "Foreseeability is established through evidence of 'specific previous crimes on or near the premises.'" 267 S.W.3d [at] 12 . . . (quoting *Timberwalk*, 972 S.W.2d at 756). In *Trammel[l] Crow*, the court was analyzing the foreseeability of a murder at the Quarry Market, a shopping mall. *Id.* at 11–12. In narrowing the relevant criminal history to be included in its foreseeability analysis, the court noted[,]
>
>> In the two years prior to [the victim's] death, 227 crimes were reported at the Quarry Market. Of these reported crimes, 203 were property and property-related crimes— mostly thefts[] but also a handful of burglaries, auto thefts, and incidents of vandalism. Fourteen "other crimes" occurred—thirteen simple assaults and one incident of weapon possession. The remaining ten crimes, all robberies, were classified as violent crimes—a category that also includes murder, manslaughter, rape, and aggravated assault.
>>
>> Although criminal conduct is difficult to compartmentalize, some lines can be drawn. For instance, we have held that reports of vandalism, theft, and neighborhood disturbances are not enough to make a stabbing death foreseeable. Similarly, although the repeated occurrences of theft, vandalism, and simple assaults at the Quarry Market signal that future property crimes are possible, they do not suggest the likelihood of murder. Accordingly, like the court of appeals, we limit our review to the ten instances of violent crime that took place at the Quarry Market during the two years prior to [the victim's] death.

27

*Id.* at 13 (footnote omitted).

*Flanagan*, 2017 WL 5615567, at \*3.

*Flanagan* went on to catalog cases cited by its appellant that permitted the admission of crimes within a broad area.[7] In turn, *Flanagan* noted that its appellee cited cases supporting a much more restricted view.[8] After this analysis, *Flanagan* concluded that

> [b]ased on the Texas Supreme Court's analysis in *Trammel[l] Crow*, we must conclude the relevant criminal history is limited to the hotel and its immediate vicinity. As a result, the summary[-]judgment evidence

[7]As *Flanagan* noted, the appellant relied on the following authority: *Tex. Real Estate Holdings, Inc. v. Quach*, 95 S.W.3d 395, 398–99 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (considering crime occurring within census tract that encompassed 3.5 square miles in area where apartment complex was located); *Dickinson Arms–REO, L.P. v. Campbell*, 4 S.W.3d 333, 338 (Tex. App.—Houston [1st Dist.] 1999) (considering crime occurring in city's sector that covered less than one square mile), *pet. denied*, 35 S.W.3d 633 (Tex. 2000); and *Plowman v. Glen Willows Apts.*, 978 S.W.2d 612, 618 (Tex. App.—Corpus Christi–Edinburg 1998, pet. denied) (noting summary-judgment evidence did not include any report of violent personal crime at apartment complex or in the neighborhood surrounding the apartment complex).

[8]*Flanagan* noted that *Trammell Crow* restricted the "relevant criminal history in that case to violent crimes that occurred at the mall." *Id.* at \*4 (citing *Trammell Crow* 267 S.W.3d at 13). *Flanagan* then cataloged other cases that restricted the proximity analysis. *Id.* (first citing *Park*, 429 S.W.3d at 147 (limiting crimes to those occurring at a gas station or immediately adjacent to the gas station and rejecting reliance on evidence of violent crimes reported within a one-mile radius of the gas station); then citing *Perez v. DNT Global Star, L.L.C.*, 339 S.W.3d 692, 702–03 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (holding crimes occurring at apartment complexes within one-mile radius of apartment complex where offense in question occurred not relevant to foreseeability analysis and limiting consideration to five crimes occurring at apartment complex in question); and then citing *Mayer v. Willowbrook Plaza Ltd. P'ship*, 278 S.W.3d 901, 921 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (rejecting evidence regarding crimes occurring in police beat that included two other shopping malls in addition to shopping mall in question)).

28

presented by [appellants that relied] on crimes that [had] occurred within a one-mile or one-half-mile radius was not sufficiently narrowed.

*Id.*

Here, we conclude that the unique nature of the Hurricane Harbor premises vested the trial court with discretion to conclude that crimes that occurred off its secured premises were not probative to show that those crimes would migrate over its hard boundaries and through its controlled gates and did not make crimes within those bounds foreseeable. Again, we note that Williams offers no argument challenging this proposition. Further, we are not holding that the proximity analysis offered by Williams will never be appropriate, only that it is a mismatch for the circumstances before us. This mismatch is a blanket proposition that justified the exclusion of a class of crimes offered by Williams, that is, those occurring off premises. Again, the fact that there was a categorical basis for exclusion blunts Williams's recurring theme in her briefing that the trial court allegedly abused its discretion by placing the burden on Williams to meet all the *Timberwalk* factors.

> **b. The trial court properly excluded evidence of off-premises crimes because of a lack of publicity.**

The parties are also at odds regarding how a lack of publicity of the off-premises crimes impacted their admissibility. Hurricane Harbor argues in essence that its ability to foresee a crime on its premises cannot be predicated on crimes for which there is no evidence that it had any knowledge. Williams takes the position that the number of crimes in the vicinity can still make such crimes relevant even though the

29

premises owner did not know of them. Conflicting signals from the Texas Supreme Court complicate the issue of who has the better argument. But the logic seems inescapable that if there is no evidence that a premises owner knew of off-premises crimes, those crimes are no evidence of foreseeability and should not be admitted.

In her opening brief, Williams moves quickly through the question of publicity. After setting forth the law, she presents an argument that speaks only to crimes that had occurred on the premises of Hurricane Harbor and Six Flags:

> Here, 34 of the past crimes occurred on the Hurricane Harbor and Six Flags premises, so publicity was not disputed for those crimes. Additionally, [Williams] tendered evidence showing publicity of crime in the vicinity of Hurricane Harbor and Six Flags. The trial court excluded that evidence as well. Even so, the trial court excluded the evidence of all but one prior crime. [Record references omitted.]

We initially note, as does Hurricane Harbor's brief, that the six exhibits that Williams claims were notice of crimes in the vicinity all related to the March 2021 incident in the parking lot of Six Flags—the sole incident that the trial court permitted into evidence. How those exhibits would establish notice of other off-premises crimes is unexplained. Williams argues in her reply brief that the number of incidents may act as a proxy for publicity. We will discuss those cases below.

Again, it is the guiding principle of *Timberwalk* that "[w]hether [a risk of criminal conduct] was foreseeable must not be determined in hindsight but rather in light of what the premises owner knew or should have known before the criminal act

occurred." 972 S.W.2d at 757. *Timberwalk* described how the publicity factor impacts the foreseeability analysis:

> The publicity surrounding the previous crimes helps determine whether a landowner knew or should have known of a foreseeable danger. A landlord often has actual knowledge of previous crimes occurring on the premises through tenants' reports. Actual notice of past incidents strengthens the claim that future crime was foreseeable. However, unreported criminal activity on the premises is no evidence of foreseeability. Previous similar incidents cannot make future crime foreseeable if nobody knows or should have known that those incidents occurred. Property owners bear no duty to regularly inspect criminal records to determine the risk of crime in the area. On the other hand, when the occurrence of criminal activity is widely publicized, a landlord can be expected to have knowledge of such crimes.

*Id.* at 758–59 (footnote omitted).

Obviously, *Timberwalk* does not create a bright-line rule barring evidence of crimes that the property owner did not know about. However, it does create a quandary of how the evidence is relevant if (1) a property owner has no duty to inspect crime records and (2) there is no evidence that some other mechanism imparted notice to the owner.

The picture becomes grayer looking at the supreme court's analyses in *Mellon* and *Trammell Crow*. In *Mellon*, the question was whether 190 crimes reported "near" a parking garage were probative that a rape in a parking garage was foreseeable. 5 S.W.3d at 657.[9] How exactly those crimes impacted the foreseeability analysis is

---

[9]Apparently, the crimes were within a quarter mile of the garage. *See Mellon*, 5 S.W.3d at 657, 664 (Baker, J., concurring), 667 (O'Neill, J., dissenting).

unclear; the supreme court used the evidence of other crimes with notice of other events to hold that there was some evidence of foreseeability:

> While there is no evidence that any of these crimes received publicity and [the parking garage owner] was not required to inspect police records to determine whether its garage was in a high crime area, the summary[-]judgment evidence establishes that [the parking-garage owner] was aware that property crimes had occurred, including the theft of a[n] . . . employee's car. Another . . . employee complained to the garage manager "about the virtually non-existent security" in the garage, which compelled the employee to seek an escort to her car when she worked late. Furthermore, [the parking-garage owner] knew that vagrants frequented the garage and sometimes drank there.
>
> Together, these facts constitute some evidence that violent criminal conduct was foreseeable. But while it may have been foreseeable that a violent crime such as rape might occur, this does not end our analysis.

*Id.* The unanswered question is how probative the court would have found the other crimes had there not been the additional evidence it cited.

Then, in *Trammell Crow*, the supreme court noted its prior analysis in *Mellon* when addressing not publicity but the question of recency and frequency. 267 S.W.3d at 15–16. The supreme court stated that it examined recency and frequency in tandem. *Id.* at 15. It then contrasted the evidence of *Mellon*'s 190 crimes to the evidence before the trial court that consisted of prior crimes on the shopping-mall premises and statistical evidence that the chance of becoming a crime victim on the shopping-mall premises was lower than in San Antonio where the shopping mall was located. *Id.* The appellee crime victim in *Trammell Crow* challenged the probative value of the comparison between the premises and the city overall because it did "not

32

take into account the mobility of the city's population" and because "reliance on the citywide crime rate w[ould] lead to an incomplete and misleading analysis that fails to include important geographic and demographic considerations." *Id.* at 16. The supreme court responded to the argument by noting that though the comparison was imperfect, it was still probative:

> [The appellees] are certainly right that numeric comparisons may be imperfect and may omit important, less-easily-quantified considerations. Furthermore, we emphasize that no one ratio or odds calculation conclusively resolves the frequency analysis. Crime counts, crime rates, odds calculations, and other comparisons merely serve as data points [that] a court may rely on in determining the frequency of crime in a certain location; just as the frequency analysis is merely one factor in the total foreseeability analysis. Nevertheless, these calculations, performed by a qualified expert, can be used to help a court resolve the difficult question of whether criminal conduct is reasonably foreseeable.

*Id.*

And as Williams notes in her reply brief, there are opinions that downplay the need for publicity when there is evidence of frequency. For example, she cites the Fourteenth Court of Appeals for its holding that "[a]lthough the publicity factor weighs against finding a duty, we conclude that the number of similar crimes in the recent past in the immediate vicinity outweighs the publicity factor." *Rivera v. S. Green Ltd. P'ship*, 208 S.W.3d 12, 20 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). But *Rivera* did not explain how it reached its conclusion that the number of events could impart knowledge if the events were not publicized in a way that the premises owner should have known of them.

33

Williams also cites *Watanabe* for the proposition that "there was no evidence of the publicity factor at all, yet the appellate court still held [that] there were fact issues on foreseeability." 650 S.W.3d at 129–30. But Williams paints with too broad a brush. *Watanabe* was an appeal from a summary judgment in which a police officer had opined "that the assault was foreseeable because of the prevalence of crime generally in the area and that a property owner 'would know or should have known of the high incidence' of crime in the vicinity." *Id.* at 129. The court also noted the proximity of the parking lot where an assault occurred to a nightclub. *Id.* at 129–30. That evidence entered into the court's analysis on the question of knowledge because

> [t]here is no evidence in the summary-judgment record about what [the premises owner/defendant] actually knew about prior crime in the area. No evidence about whether the offenses were publicized was offered in response to the summary[-]judgment motion. But [the premises owner/defendant] owned both [an adjoining night club] and the parking lots leased by [the owner of nearby parking lots], and evidence regarding both leases is in the summary-judgment record. Therefore, we can conclude that [the premises owner/defendant] knew that there was a nightclub operating until at least 2:00 a.m. across the street from lots used for valet and self-parking.

*Id.* Thus, we disagree with Williams that *Watanabe* held that no evidence of publicity is a nonevent because at the summary-judgment stage, the court looked to other evidence that imparted notice to the premises owner that was sufficient to create a fact issue on the issue of knowledge.

Countering Williams's position, there is authority that looks to the lack of publicity to determine the probative value of crimes occurring in a vicinity. The

El Paso Court of Appeals examined whether there was evidence that an aggravated assault that began in a motel parking lot was sufficiently foreseeable to support the jury's verdict awarding damages for the assault. *Jai Jalaram Lodging Grp., L.L.C. v. Leribeus*, 225 S.W.3d 238, 245–46 (Tex. App.—El Paso 2006, pet. denied). The plaintiff's expert prepared an analysis that showed a dramatic increase in crime within a one-mile radius of the motel over the two years preceding the assault and noted a further increase over the two months immediately preceding the assault. *Id.* at 243–44. The El Paso court offered two bases for its holding that the assault was not foreseeable as a matter of law. *Id.* at 245–46. The first was that the rising crimes in the surrounding area were not of the same degree and severity as the on-premises crime committed and that the crime rate had only increased slightly. *Id.* at 245. The court also held that evidence of publicity was lacking:[10]

> With regard to publicity surrounding previous crimes, there was no evidence that criminal activity within the one-mile radius of the Comfort

[10]*Jai Jalaram* specifically described the publicity factor as follows:

The publicity surrounding the previous crimes helps determine whether a landowner knew or should have known of a foreseeable danger. *Timberwalk*, 972 S.W.2d at 758. Actual notice of past incidents strengthens the claim that future crime was foreseeable. *Id.* However, unreported criminal activity on the premises is no evidence of foreseeability. *Id.* at 758–59. Property owners bear no duty to regularly inspect criminal records to determine the risk of crime in the area. *Id.* at 759. On the other hand, when the occurrence of criminal activity is widely publicized, a landlord can be expected to have knowledge of such crimes. *Id.*

*Id.* at 242–43.

Inn, as indicated by either police call reports or incident reports, was widely publicized in the media or otherwise known to Appellant. Rather, it was undisputed that for Appellant to have knowledge of this criminal activity, the property owner would have had to contact the Alvin Police Department and request such information presumably at regular intervals during the preceding two years. Property owners bear no duty to regularly inspect criminal records to determine the risk of crime in the area. *Timberwalk*, 972 S.W.2d at 759. Further, there was no evidence that Appellant had actual knowledge of previous crimes at the Comfort Inn, neighboring motels, or surrounding area that were sufficiently similar to the criminal conduct in question as to put it on actual notice of the risk of the future criminal activity on its property.

*Id.* at 245–46.

In affirming a summary judgment granted in favor of a premises owner, the Dallas Court of Appeals also discussed a plaintiff's efforts to introduce hundreds of crimes that had occurred within a one-mile radius of a gas station where a criminal injured the plaintiff. *Park*, 429 S.W.3d at 145. *Park* reiterated the guidance of *Timberwalk* on proximity and publicity and offered the following discussion with respect to the questions of proximity and publicity:

We first examine the *Timberwalk* factors of proximity and publicity as they relate to this case. Proximity means crimes occurring on the property in question or in its immediate vicinity. *Timberwalk*, 972 S.W.2d at 757. The publicity surrounding previous crimes helps determine whether a landowner knew or should have known of a foreseeable danger. *Id.* at 758. Property owners bear no duty to regularly inspect criminal records to determine the risk of crime in the area. *Id.* at 759. When the occurrence of criminal activity is widely publicized, however, an owner can be expected to have knowledge of such crimes. *Id.*

There is no dispute that the five violent crimes recounted above occurred at or immediately adjacent to the Exxon Mobil station and that Exxon Mobil was aware or should have been aware of them. In addition to these crimes, [appellant] urged the trial court to consider evidence of

36

"a substantial pattern of major criminal activity" in the area near the Exxon Mobil station. [Appellant] presented evidence that in the three-and-a-half year period from January 1, 2006[,] to July 15, 2009, there were a total of 353 violent crimes reported within a one-mile radius of the Exxon Mobil station. Two of these crimes were murders, 160 were robberies, and 147 were aggravated assaults.

*Id.* at 147. *Park* concluded that crimes occurring "at the property" did not occur with a sufficient frequency to make the crime at issue foreseeable. *Id.* at 147–48. The Dallas court then held that "[r]egarding the crimes within a one-mile radius of the gas station, there is nothing in the record to show any of those crimes were publicized such that Exxon Mobil should have been aware of them." *Id.* at 148; *see also JPMorgan Chase Bank, N.A. v. Borquez*, 481 S.W.3d 255, 274 (Tex. App.—Dallas 2015, pet. denied) (analyzing *Park* and noting that "the record does not 'show what publicity was given' as to" crimes in the vicinity).

The First Court of Appeals also rejected the proposition that off-premises crimes impacted the foreseeability analysis when there was nothing to indicate that the premises owner knew of the crimes. *Viera v. Little Caesar Enters., Inc.*, No. 01-10-00863-CV, 2011 WL 6306653, at *5 (Tex. App.—Houston [1st Dist.] Dec. 15, 2011, no pet.). *Viera* applied the logical principal that foreseeability depends on a premise owner's knowledge:

> There is no evidence indicating that [appellee] knew or should have known about the fight in the washateria or the attempted robbery on the sidewalk near the shopping center. *See Timberwalk*, 972 S.W.2d at 759 ("Previous similar incidents cannot make future crime foreseeable if nobody knows or should have known that those incidents occurred.[ . . .]").

*Id.*

37

Here, Williams relied on specific crimes that occurred in the one-mile area surrounding Hurricane Harbor (and Six Flags). If those crimes were to impact the foreseeability analysis, logic dictates that there had to be proof that something gave the premises owner knowledge that the crimes had occurred. But Williams cites no evidence of publicity of crimes in the vicinity other than the exhibits that the trial court refused to admit, which did not publicize any crimes in the Park's vicinity other than the one crime that was already known to Hurricane Harbor because it involved the shooting on the premises of Six Flags. Again, how publicity of that event imparted knowledge of the other approximately 120 off-premises crimes is unexplained.

And we do not read the nebulous statements in *Mellon* and *Trammell Crow* that we highlighted above to mean that crimes occurring in the vicinity of a premises are relevant without *any* proof that the premises owner knew of them. To accept that hypothesis would impose exactly the duty that *Timberwalk* states that it is not imposing—a duty to search crime records. As we read *Mellon*, its holding is not that a premises owner is automatically on notice of crimes occurring in the vicinity but that the premises owner possessed facts that created a fact issue regarding whether the owner should have known that crime was migrating onto its premises. Finally, *Trammell Crow* did hold that statistical evidence, including crime counts, has relevance in establishing the frequency of crime, but that holding does not translate into the principle in *Rivera* cited by Williams that turns the foreseeability analysis on its head,

38

that is, the mere frequency of events of which the premises owner had no knowledge can be used to show the owner knew or should have known that an event was foreseeable.  Here, Williams does not argue that Hurricane Harbor had knowledge of the off-premises crimes because the occurrence of those crimes was publicized, and that is another rationale supporting the trial court's discretion to exclude evidence of those specific crimes.

> ### c.  Williams fails to establish that the trial court erred by excluding evidence of off-premises crimes because they lacked similarity to the event at issue.

Another *Timberwalk* factor is similarity, with the thumbnail of that principle being that "[t]he previous crimes must be sufficiently similar to the crime in question as to place the landowner on notice of the specific danger."  972 S.W.2d at 758.  In her opening brief, Williams takes a blanket approach, arguing that the trial court erred by not admitting approximately 150 other crimes (including the nearly 120 off-premises crimes) because "[s]imilar crimes would thus include parking[-]lot altercations, assaults causing bodily injury, aggravated assaults, robberies, use or display of dangerous weapons, domestic violence, and other violent crimes."  In her reply brief, Williams retrenches her count and winnows her list to only fifty off-premises crimes that she claims should have been considered because they were

crimes that "involved serious felonies and crimes involving gun and deadly weapon use."[11]

We take Williams's reduced list as an implied concession that—notwithstanding her statements to the contrary—she no longer asserts every off-premises crime met the *Timberwalk* similarity standard. And the standard of similarity in her reduced list that sweeps up "serious felonies and crimes involving gun and deadly weapon use" is a standard that we conclude is also too broad. After we reject Williams's standard as too broad, it is not our task to then define what we consider to be the proper similarity standard and then test each of the off-premises crimes now listed against our self-formulated standard.

To begin, as we noted, Williams's opening brief takes the position that crimes of "domestic violence" were relevant to the question of whether D.T.'s murder in Hurricane Harbor's parking lot was foreseeable. As Hurricane Harbor argued in the trial court and continues to argue on appeal, even if we accepted that crimes occurring off the premises were probative on the question of foreseeability, domestic disputes do not augur crimes against strangers. *See QuikTrip Corp. v. Goodwin*, 449 S.W.3d 665, 675 (Tex. App.—Fort Worth 2014, pet. denied) ("[D]omestic disputes do not typically augur more serious crimes against strangers."); *Taylor v. Louis*, 349 S.W.3d 729, 737 (Tex. App.—Houston [14th Dist.] 2011, no pet.) ("Isolated instances of domestic

---

[11]Williams's reply brief's chart of fifty off-premises crimes lists PX-215, PX-237, and PX-259. These exhibits are not indexed in the reporter's record before us.

violence between residents do not indicate an unreasonable risk of assault between unrelated nonresidents on the property."); *Jai Jalaram Lodging,* 225 S.W.3d at 242 ("On the other hand, a spate of domestic violence in the complex does not portend third[-]party sexual assaults or robberies."); *Ramirez v. AHP Mut. Hous. Ass'n, Inc.,* No. 14-04-00159-CV, 2005 WL 425486, at *2 (Tex. App.—Houston [14th Dist.] Feb. 24, 2005, no pet.) (explaining that domestic-violence incidents are "not similar to a random attack from a stranger"). Hurricane Harbor's brief itemized the exhibits that Williams sought to introduce involving domestic-violence crimes.[12] As most of the crimes involving domestic violence are not included in Williams's reply brief, we view this as an implied concession that Hurricane Harbor's argument is correct that crimes of domestic violence lack the required similarity.

Hurricane Harbor also notes *Trammell Crow*'s holding that "simple assaults . . . do not suggest the likelihood of murder." 267 S.W.3d at 13. Again, Hurricane Harbor lists a number of exhibits that fall within this category.[13] These crimes are not included in the chart in Williams's reply brief. We view this as another implied

---

[12]Hurricane Harbor catalogs the domestic disputes that occurred outside the premises as the following thirty reports: PX-139; PX-143; PX-159; PX-161; PX-162; PX-166; PX-169; PX-174; PX-177; PX-187; PX-188; PX-193; PX-198; PX-200; PX-206; PX-211; PX-216; PX-219; PX-230; PX-232; PX-244; PX-253; PX-256; PX-257; PX-268; PX-275; PX-276; PX-281; PX-283; and PX-288. Of these reports, only three appear in the chart included in Williams's reply brief.

[13]Hurricane Harbor's list of simple assaults that occurred outside the premises includes PX-124, PX-145; PX-162; PX-166; PX-173; PX-178; PX-198; PX-206; PX-253; PX-257; and PX-292.

concession that Hurricane Harbor's argument is correct that the simple-assault crimes lack the required similarity.

As noted in the chart in Williams's reply brief, she now specifies only fifty off-premises crimes rather than the approximately 120 that she sought to introduce at trial and offers no argument for their admission other than that the trial court lacked the discretion to deny their admission—an argument that we have already rejected. This creates the implied concession that we stated above: the crimes not listed lack sufficient similarity. As we have noted, the trial court ruled individually on the admissibility of each crime. Because Williams failed to offer a rationale for the similarity of almost 60% of the crimes that she claimed established foreseeability, we exclude those crimes from further analysis. *See generally* Tex. R. App. P. 38.1(i).

Again without saying so, Williams appears to argue that the fifty off-premises crimes that her reply brief lists bear sufficient similarity because they fall under the rubric she adopts—"serious felonies and crimes involving gun and deadly weapon use."[14] In support of her argument that her list of crimes falls under this rubric, Williams's chart includes snippets categorizing the crimes and a brief recitation of each crime's underlying facts, for example, "aggravated robbery with firearm[:] suspect brandished a firearm and demanded victim's possessions." But it was

---

[14]The statutory definition of a felony as "an offense so designated by law or punishable by death or confinement in a penitentiary" is so all-encompassing that it provides no viable criteria to guide the similarity analysis. *See* Tex. Penal Code § 1.07(23).

Williams's theory that the presence of guns in the vehicles in Hurricane Harbor's parking lot required special security measures to quickly address confrontations that might escalate into gun use when there was an outflow of Park patrons at the time that the Park closed. Based on the criteria used in Williams's brief, any crime in the surrounding area that "involved serious felonies and crimes involving gun and deadly weapon use" is probative that a crime of the type in which D.T. was killed was foreseeable. In our view, such a similarity criterion is so broad as to be meaningless.

Certainly, there need not be a one-to-one correspondence between a prior crime and the one at issue to meet the similarity criterion: "Foreseeability requires only that the general danger, not the exact sequence of events that produced the harm, be foreseeable." *Timberwalk*, 972 S.W.2d at 756. Williams highlights that prior crimes need not be identical: for example, "[a] string of assaults and robberies in an apartment complex make the risk of other violent crimes, like murder and rape, foreseeable." *Id.* at 758. But by the same token, the "general danger" required by *Timberwalk* goes beyond the fact that we live in a violent society, and to read the statement that a robbery—because it is a violent crime or because it involved a gun—forebodes the type of crime involved in our facts would render the similarity requirement no criterion at all. As *Timberwalk* explained,

> "[C]rime may be visited upon virtually anyone at any time or place[,"] but criminal conduct of a specific nature at a particular location is never foreseeable merely because crime is increasingly random and violent and may possibly occur almost anywhere, especially in a large city. If a landowner had a duty to protect people on his property from criminal

43

conduct whenever crime *might* occur, the duty would be universal. This is not the law. A duty exists only when the risk of criminal conduct is so great that it is both unreasonable and foreseeable. Whether such risk was foreseeable must not be determined in hindsight but rather in light of what the premises owner knew or should have known before the criminal act occurred.

*Id.* at 756–57 (footnote omitted). To create a criterion that a deadly weapon is frequently used in crimes would also erase any true requirement for similarity; as the testimony in this case underscored, guns are a feature of Texas society.

Indeed, *Trammell Crow* delimited the similarity analysis when it addressed and highlighted that courts should be careful in setting the bounds of the similarity criterion even while acknowledging that a one-to-one correspondence is not required between the crime at issue and a prior crime. 267 S.W.3d at 16. The easiest illustration of the line-drawing done by *Trammell Crow* is to quote its similarity analysis:

In addition to the recency and frequency of past crimes, a court must consider the similarity of the past crimes to the criminal conduct in question. Foreseeability does not require "the exact sequence of events that produced the harm [to] be foreseeable,"—rather, previous crimes need only be "sufficiently similar to the crime in question as to place the landowner on notice of the specific danger." Furthermore, we have recognized that crimes fitting one category can relate to or result in crimes of another category: a string of violent crimes such as robberies or assaults can make other violent crimes like murder or rape foreseeable; a thief entering a dwelling to steal property may also commit personal crimes.

No one had been murdered at the Quarry Market prior to [the victim's] shooting, but ten robberies had occurred, many with violent characteristics. One of the incidents is particularly striking—a man exiting the theater at 12:30 a.m. on a Monday morning was approached by a group of strangers, who followed him back into the theater, knocked him down, and stole his valuables before fleeing the scene.

44

However, unlike the attack on [the victim], the strangers first accosted the victim; their ultimate aim was to take his property; and they did not use a deadly weapon or seriously injure him.

Of the remaining nine crimes, three involved the use of guns, and another involved an unknown object that could have been a gun. However, none of these weapons were ever fired. Three of the nine incidents involved the use of physical force, and four others involved a threat of serious injury or death. However, unlike the attack on [the victim], in all three situations involving physical contact, the suspect used force only after the victim pursued the suspect or otherwise tried to regain possession of the stolen items. Furthermore, no one was seriously injured in any of the nine robberies. Two other differences are noteworthy. First, in six of the nine crimes, the perpetrator made a demand on the victim for property, indicating that the primary purpose of the criminal conduct was to obtain property. There is no evidence that [the victim's] assailant made any demand, threat, or said anything at all; the assailant simply started shooting. Second, three of the robberies were perpetrated on businesses—two stores and a bank—rather than individuals, like the attack on [the victim].

*Id.* at 16–17 (citations omitted).

Other courts have applied *Trammell Crow*'s analysis to search more deeply for similarities that give other crimes a predictive power than one that relies on an all-encompassing criterion of "serious felony" or the presence of a deadly weapon:

- *Perez* (albeit as part of a factual sufficiency review of a jury's no-liability finding) carefully sorted the similarity between prior crimes and the one at issue, and the fact that a gun was used in the commission of a prior crime did not make that prior crime sufficiently similar. 339 S.W.3d at 703–04.

- *Viera* analyzed prior crimes to put them in the context of who was the victim, the time of day that the crime occurred, and the physical setting of the crime:

    Two of the three prior criminal incidents at Little Caesar's are largely dissimilar to the armed robbery in which [the

45

crime victims] were involved. An employee allegedly stealing two bottles of coke does not put a property owner on notice of a danger of armed robbery. While the grabbing of the money bag from [one of the premises owner's] employee[s] on the way to deposit money in the bank is similar to the armed robbery in that it involved stealing cash from [the premises owner], it is different in three key aspects: it occurred outside of the Little Caesar's property; it occurred during the day; and, most importantly, it did not involve a weapon or any threat of deadly force. But the armed robbery in December of 2007 bears several significant similarities to the armed robbery involving [the crime victims]: both involved the use of guns[;] were aimed at stealing the cash in the pizzeria's cash register[;] and occurred at night, inside the Little Caesar's. In the previous robbery, however, no shots were fired, and the robber seems to have focused exclusively on the employee working the cash register, without threat to the pizzeria patrons.

2011 WL 6306653, at *5.

- *Park* read *Trammell Crow* as requiring a prior crime "to put the owner on notice of the specific danger." 429 S.W.3d at 147–48. *Park*'s analysis looked more deeply for similarities than the criteria that Williams offers:

> Here, four of the five violent crimes at the Exxon Mobil station in the two years prior to [appellant's] shooting were robberies. In two of these robberies, suspects robbed the store, not its customers. Another robbery involved a non-customer on the street adjacent to the gas station. A pocket knife was used in that crime[,] and the complainant sustained only minor injuries. In the one robbery involving a customer, a pocket knife was again used and the injuries the victim sustained were minor. The fifth crime on the property was an assault with a knife after a disagreement between customers. Only once in the two years preceding the robbery of [appellant] was a gun used to commit a crime at or adjacent to the gas station. And in that instance the gun was displayed to a store clerk, not fired. At no

46

time in the preceding two years was anyone shot at the Exxon Mobil station.

> Considering the five *Timberwalk* factors, we conclude as a matter of law that the aggravated robbery of [appellant] was not foreseeable based on evidence of prior crimes. *Cf. Trammell Crow*, 267 S.W.3d at 17 (ten violent crimes in two years preceding shooting death at mall insufficient to put property owner on notice that murder would occur as part of robbery on premises).

*Id.* at 148 (footnote omitted); *see also* [*JPMorgan Chase*] *Bank*, 481 S.W.3d at 272–73 (describing and adopting multi-layered similarity criteria applied in *Park*).

Within the remaining fifty examples of off-premises crimes—winnowed from the approximately 120 crimes that Williams originally claimed were admissible—there might be crimes that met a criterion tailored to the circumstances of the facts at issue. Instead, she relies on a similarity criterion that we view as overly broad. Without the effort by Williams to tailor a suitably narrow criterion, she leaves us without an appropriate standard by which we can test the trial court's exercise of its discretion. Instead, she relies on overly broad criterion that the trial court—within its discretion—declined to apply.

To a certain extent, the foreseeability analysis can be a numbers game. Williams sought to find a basis to put a large number of off-premises crimes before the jury, but we conclude that her effort was self-defeating. She offers no explanation of the similarity between the crime at issue and the almost 60% of crimes that she tried to introduce at trial. With the remaining subset, she argues for a similarity

47

criterion that is too broad and that we will not accept. This is another reason—beyond our conclusions that the off-premises crimes do not satisfy the proximity or publicity factors—that supports our conclusion that Williams has failed to establish that the trial court abused its discretion by excluding the off-premises crimes.[15]

> **5.** **Williams has failed to establish that the trial court committed error in its decisions regarding the admissibility of on-premises crimes.**

Of the more than thirty crimes that Williams sought to introduce as occurring on the premises of Six Flags and Hurricane Harbor, Williams's chart in her reply brief winnows the list down to twelve. Most of these examples lack sufficient similarity to show that the trial court erred by excluding them. For the smattering that are open to question, Williams makes no argument that she was harmed by the exclusion of that smattering.

Again, Williams categorizes the on-premises crimes that she lists as "serious felonies and crimes involving gun and deadly weapons use," but her chart offers only

---

[15]As noted above, Williams tries to sidestep these failings by arguing that the trial court construed *Timberwalk* to create "elements" rather than "factors." In an attempt to show an abuse of discretion, she argues that the trial court rigidly applied the *Timberwalk* factors so narrowly that it required a one-to-one correspondence between the facts of the prior crime and the incident at issue. Williams wants to use this broad brush to strip the trial court of discretion to apply the *Timberwalk* factors to the question of admissibility by claiming that their probative value must be viewed in a tandem application of all the factors that, in effect, leaves the trial court without the ability to look at the discrete deficiencies in the evidence that Williams offered. Indeed, she argues that because the prior crimes were "violent," she stripped the trial court of its gatekeeper function. As we note at various points in this opinion, even Williams backtracks from an attempt to defend so ill-defined an admissibility criterion.

the briefest description of each crime's facts. Because of the limited number of examples that Williams offers, we will take on the task of describing each event as detailed in the exhibits that Williams sought to admit:

(1) Plaintiff's Exhibit 86 concerns a sexual assault that occurred at the Park in June 2019 involving an adult victim with the mental capacity of an eight-year-old. The victim was raped by the assailant, who was someone the victim was dating.

(2) Plaintiff's Exhibit 87 concerns an offense categorized as indecency with a child and sexual conduct, involving allegations that a known individual made sexual comments and inappropriately touched a juvenile. The offense's detailed facts were redacted in the report.

(3) Plaintiff's Exhibit 88 concerns an altercation between a Park employee and his supervisor after the employee was sent home for violating the Park's dress code. The supervisor briefly touched the employee's arm in a nonthreatening manner to guide him toward the exit, and the employee punched the supervisor's jaw. Video surveillance corroborated the supervisor's account. The supervisor suffered no injury, required no medical treatment, and experienced no lasting effects.

(4) Plaintiff's Exhibit 92 consists of an offense report alleging sexual assault of a child under seventeen, stating that the suspect intentionally and knowingly penetrated the child's sexual organ with his fingers, engaged in sexual contact, and caused offensive and provocative contact.

(5) Plaintiff's Exhibit 93 describes a confrontation inside the Park that began when a patron mistakenly picked up another person's shoes and was pushed by the shoes' owner. The individual then became upset and challenged the victim to finish what they had started in the parking lot, which caused the victim's father to fear that a weapon might be involved and to seek assistance from security and officers. The suspect was allowed to leave before further investigation, and the incident was ultimately deemed unfounded because the suspect used reasonable force to retain his property.

(6)     Plaintiff's Exhibit 96 concerns a traffic-related dispute in which one motorist allegedly threatened to shoot another following a near collision. The investigating officer expressed doubt that a threat occurred, noting that the complainant gave inconsistent accounts, there were conflicting versions of events regarding the presence or use of a firearm, and no independent third-party witness corroborated either account.

(7)     Plaintiff's Exhibit 105 describes a parking-lot altercation at Six Flags that arose from a dispute over a parking space. A male individual stood in a parking spot and refused to allow the complainant's vehicle to park, allegedly making threats, including to slash the complainant's tires and to kill her and her children. The complainant reported feeling fearful and positioned herself between the individual and her children until the man left. Although police investigated the incident and the complainant requested charges, the District Attorney's Office declined prosecution due to conflicting accounts and determined that no criminal offense had occurred.

(8)     Plaintiff's Exhibit 107 describes a verbal altercation in the Six Flags parking lot involving a woman who was waiting in her vehicle to pick up her daughter. A person approached and demanded that she move her car, leading to a heated exchange when the complainant refused. The encounter consisted solely of verbal confrontation, the other person could not be identified, and law enforcement took no further action.

(9)     Plaintiff's Exhibit 109 describes a parking-space dispute in the Six Flags parking lot. A woman exited her SUV, claimed she was saving the space, and struck the complainant's truck while yelling threats and demanding that the occupants get out so she could assault them. The complainant and other occupants remained inside the SUV out of fear. The woman later returned with a male, and both continued yelling and threatening the occupants, with the woman attempting to reach through an open window. The complainant provided both individuals' descriptions and reported feeling threatened by their conduct.

(10)    Plaintiff's Exhibit 111 documents an incident in which Six Flags's security reported an intoxicated individual who had fallen, refused medical assistance, and remained on the premises. Responding officers observed multiple signs of intoxication, including slurred speech, bloodshot and watery eyes, the odor of alcohol, and unsteady

50

movement. The suspect admitted to consuming alcohol. While the officers attempted to arrange transportation for the individual, she became verbally aggressive, approached the officers, "bowed up," and intentionally struck a police officer in the chest with her hand.

(11) Plaintiff's Exhibit 114 describes an altercation inside Six Flags on March 20, 2021, during which Arlington police officers responding to a reported fight attempted to detain an agitated male suspected of assaulting a security staff member. During the detention, a female intervened by striking and physically struggling with security staff despite repeated commands to stop. Security staff restrained and handcuffed her after several minutes of resistance. The investigation determined that she had also shoved a uniformed Six Flags security staff member, causing the staff member to fall and injure his ankle.

(12) Plaintiff's Exhibit 118 describes a physical altercation inside Six Flags that arose when park patrons became upset that the complainant's family used fast passes to skip a ride's line. The dispute escalated after an argument with the ride operator, and three female suspects physically assaulted the ride operator by punching her, placing her in a headlock, and striking her face and stomach. A male suspect then punched the complainant and his mother, and during the melee another individual pulled a woman's hair. The fight was broken up, the suspects left the area, and the complainant and his family were escorted to the Six Flags security office.

Again, Williams's trial theory was a need for heightened parking-lot security because if an altercation were not quickly deescalated, the guns in patrons' cars could come into play. As we have noted, there need not be a one-to-one correspondence between the fact of a prior crime and the one at issue to meet the standard of a "general danger," but there still must be facts that establish that the prior crimes make the one that occurred foreseeable.

And again, Williams relies on the label of "serious felony" as being sufficient. But we must ask how the facts that a mentally disabled female was raped by her companion or that there were child sexual assaults inside the Parks made it foreseeable that D.T.'s murder would occur as it did or because of the deficiencies in parking-lot security that Williams highlighted. Simply relying on a label, Williams sidesteps any explanation of what logical nexus exists between the sexual crimes referenced in Plaintiff's Exhibits 86, 87, and 92 and D.T.'s murder that would make the crimes similar, and thus she offers no basis to conclude that the trial court abused its discretion by excluding evidence of those crimes.

Though at least involving confrontations with physical violence, the nature of several of the other crimes that Williams catalogs also leave us unconvinced that the trial court abused its discretion by excluding them. Specifically,

- Plaintiff's Exhibit 88 described an employee's hitting his supervisor because he was being sent home for not being dressed properly. How this episode prompted a foreseeable concern that the parking-lot security was inadequate is not explained.

- Plaintiff's Exhibit 93 involved a dispute regarding whether a person was taking another's shoes. Because of one of the parties challenging the other to go out to the parking lot, the other party stated a fear that the party might have a weapon in his car. The conflict never progressed to the parking lot nor was there any evidence of the presence of a weapon. The offense report eventually concluded that no crime had occurred because a party could take reasonable steps to protect his property. What is left unexplained is how the subjective fear that a gun might come into play for an event that was determined not to be a crime should have made D.T.'s tragic death foreseeable.

- Plaintiff's Exhibit 96 involved what Williams characterized as a "terroristic threat, gun in vehicle in parking lot." The investigating officer found the claim that a firearm was involved was not credible. With uncertainty as to what actually occurred or whether a crime was committed, Williams again offers no explanation why the trial court abused its discretion by excluding evidence of this event.

- Plaintiff's Exhibit 111 involved a drunk person's hitting a police officer who was attempting to arrange a ride for the drunk person. Again, Williams fails to discuss how such a dissimilar event made it foreseeable that a verbal altercation could escalate into gun violence in the absence of appropriate security measures.

- Plaintiff's Exhibits 114 and 118 involved fights that broke out within the Parks; in one case, a participant struck an officer who had confronted her, and in the other case, a fight occurred because a party believed that another was cutting in line for a ride. Williams did not challenge Hurricane Harbor's response to altercations within the Park nor claim that its screening for weapons was inadequate.[16] Again, we do not see a nexus of how these dissimilar events entered into the calculus of whether an escalating confrontation in the environment where a firearm was accessible should have alerted Hurricane Harbor to the foreseeability of the events leading to D.T.'s death and made the trial court's exclusion of evidence of these events an abuse of discretion.

Thus, nine of Williams's winnowed-down list of twelve on-premises events do not show the requisite level of similarity or even that a crime occurred. The three remaining incidents—Plaintiffs Exhibits 105, 107, and 109—do involve altercations in a parking lot where people reacted angrily when other patrons tried to take parking spots they were saving or wanted another patron to move her vehicle. The events have the marginal but unremarkable relevance that conflicts may arise in a parking lot.

---

[16]As noted, Hurricane Harbor used the Evolv system to search patrons for weapons upon their entry into the Park.

**6.    Even if the exclusion of the evidence was error, Williams fails to argue it resulted in harm.**

But even if the trial court erred by excluding the parking-lot events portrayed in Exhibits 105, 107, and 109, Williams does not argue that this limited error was harmful. *See* Tex. R. App. P. 44.1(a)(1) ("No judgment may be reversed on appeal on the ground that the trial court made an error of law unless the court of appeals concludes that the error complained of . . . probably caused the rendition of an improper judgment[.]"). Williams's harmful-error analysis is cursory both in her opening brief and in her reply brief. Williams's harm analysis in her opening brief is predicated on the assumption that "[t]he jury received evidence about only one other crime when there were *dozens* of other violent crimes on the Hurricane Harbor and Six Flags premises alone, much less the other violent crime in the vicinity." [Emphasis added.] In her reply brief, Williams's entire harm argument is as follows:

> Hurricane Harbor's harmless-error argument also fails. As demonstrated in [Williams's] principal brief, foreseeability—and thus duty and proximate cause—depends on evidence of "specific previous crimes on or near the premises." *Trammell Crow*, 267 S.W.3d at 12. The excluded police reports documented more than enough incidents to establish foreseeability and proximate cause. The reports were not cumulative of other evidence and were central to dispositive issues. Their exclusion therefore resulted in an improper judgment.

The standard of review to determine whether harm occurred from the exclusion of evidence is as follows:

> If a trial court abuses its discretion and erroneously excludes evidence, then we consider whether the error probably caused the rendition of an improper judgment. *JBS Carriers, Inc. v. Washington*, 564 S.W.3d 830, 836

54

(Tex. 2018); Tex. R. App. P. 44.1. That standard does not require the complaining party "to prove that 'but for' the exclusion of evidence, a different judgment would necessarily have resulted." *JBS Carriers . . . ,* 564 S.W.3d at 836 (quoting *State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009) [(op. on reh'g)]). Exclusion is likely harmless if the evidence was cumulative or if the rest of the evidence was so one-sided that the error likely made no difference in the judgment. *Gunn*[ *v. McCoy*], 554 S.W.3d [645,] 668[ (Tex. 2018)]. However, exclusion of the evidence is likely harmful if it was "crucial to a key issue." *Id.* Even "if the exclusion of evidence is crucial to a key issue, it is 'likely harmful,' not conclusively or per se harmful." *Id.* (quoting *Cent. Expressway Sign Assocs.*, 302 S.W.3d at 870). When determining whether the exclusion of evidence was harmful, we review the entire record and apply the same standard—whether the erroneous exclusion of evidence probably caused the rendition of an improper judgment—even when the excluded evidence related to a key issue. *Id.* at 668–69.

*Rodriguez v. OGT, LLC*, 725 S.W.3d 187, 195 (Tex. App.—Dallas 2025, pet. filed).

We have concluded that Williams has failed to establish that the exclusion of the entirety of the on-premises crimes (sans one) that she offered was harmful error. Williams offers no analysis that perhaps the three parking-lot incidents that fall into a gray area would make the trial court's error harmful, that is, how they were crucial or how their exclusion was harmful in light of the entire record. Again, the effect of excluding the incidents did no more than demonstrate that people can become angry in parking-lot incidents. Nor did any of them involve the presence of a firearm. Thus, the evidence would not have aided Williams's case that Hurricane Harbor was not taking adequate measures to protect patrons from a situation that escalated into

gun violence.  In essence, Williams's theory of harm turns on her failed "everything

had to come in" approach that we have rejected.[17]

We overrule Williams's first issue.[18]

---

[17]We will address one additional argument made by Hurricane Harbor.  It argues (1) that we should resolve this case by holding that the trial court did not err by admitting only one crime because the other police reports were incompetent evidence and (2) that this dictates a ruling that Hurricane Harbor owed no duty as a matter of law.  The argument is grounded on the proposition that "courts addressing premises cases involving crimes committed by a third party routinely reject attempts to establish foreseeability with ten or fewer crimes."  Williams counters by arguing that the trial court's admissibility decisions were in error and that Hurricane Harbor is attempting to capitalize on that error to build a strawman, which inverts the analysis because she was deprived of the ability to prove that the cumulative effect of the past crimes established foreseeability.  But Williams then argues that Hurricane Harbor's argument shows the harm of the trial court's admissibility decisions but by doing so backhandedly concedes the premise of Hurricane Harbor's argument on the effect of those decisions if they were valid:

> *By excluding the evidence* Texas law deems relevant*, there was insufficient evidence for a jury to find Hurricane Harbor negligent.*  Hurricane Harbor's no-duty argument thus confirms the harmfulness of the trial court's evidentiary rulings that excluded all but one of the past, violent crimes from evidence.  Indeed, [Williams] does not argue in this appeal that Hurricane Harbor owed a duty based on one crime.  Hurricane Harbor owed a duty because of the hundreds of similar crimes on and near its premises that the trial court did not allow into evidence.  Hurricane Harbor's no-duty argument is without merit.  [Emphasis added.]

Because the trial court did not resolve this case as a matter of law but on the basis of the jury's verdict and because Williams's experts offered opinions that the incident was foreseeable, we have done the heavy lifting on the issues that Williams raises about the trial court's decisions on what to place before the jury.  Though Hurricane Harbor's duty argument offers an easier path to affirmance, we have not taken it to give Williams's arguments as full an airing as we can.

[18]We do not reach the question of the propriety of the trial court's ruling based on Rules of Evidence 403, 404, and 803(8).  *See* Tex. R. App. P. 47.1.

**B.      Williams showed no harmful charge error.**

In her second and third issues, Williams claims that the trial court's charge contained three incidences of harmful error.  Her second issue contends that the trial court's submission of the question of Stephens's negligence and an instruction noting that he had been charged with murder was harmful error.  Her third issue contends that the trial court's instruction on new and independent cause was harmful error.  We will deal first with Williams's challenge to the new and independent cause instruction and conclude that its inclusion was not error.  Regarding the submission of the murder instruction and the question on Stephens's negligence, we conclude that (1) even if the inclusion of the murder instruction was error, the instruction did not exaggerate a fact to the extent that it was harmful; and (2) the jury's no-liability finding as to Hurricane Harbor and Six Flags Entertainment Corporation made the submission of the question of Stephens's negligence immaterial and thus was harmless.

**1.      We set forth the standard of review for jury instructions.**

The supreme court has established the standard of review that we apply to the propriety of jury instructions:

> "We review a trial court's decision to submit or refuse a particular instruction under an abuse[-]of[-]discretion standard of review." *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000).  The trial court has considerable discretion to determine proper jury instructions, and "[i]f an instruction might aid the jury in answering the issues presented to them, or if there is any support in the evidence for an instruction, the instruction is proper." *La.-Pac. Corp. v. Knighten*, 976 S.W.2d 674, 676 (Tex. 1998).

57

"An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence." *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 855–56 (Tex. 2009). An appellate court will not reverse a judgment for a charge error unless that error was harmful because it "probably caused the rendition of an improper judgment" or "probably prevented the petitioner from properly presenting the case to the appellate courts." Tex. R. App. P. 61.1; *see* Tex. R. App. P. 44.1(a). "Charge error is generally considered harmful if it relates to a contested, critical issue." *Hawley*, 284 S.W.3d at 856; *see also Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 480 (Tex. 2001) ("An improper instruction is especially likely to cause an unfair trial when the trial is contested and the evidence sharply conflicting . . . .").

*Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012) (footnote omitted).

### 2. The trial court did not err by giving an instruction on new and independent cause.

In her third issue, Williams asserts that the trial court committed harmful error by giving the jury an instruction on new and independent cause. We disagree.

The charge included an instruction in Question No. 1 that asked whether Hurricane Harbor or Six Flags Entertainment Corporation was negligent and whether that negligence was a proximate cause of the occurrence in question. The definition of proximate cause included the phrase "unbroken by any new and independent cause" and included the following instruction: "A 'new and independent cause' of an occurrence is the act or omission of a separate and independent agent, not reasonably foreseeable, that destroys the causal connection, if any, between the act or omission inquired about and the occurrence in question." Hurricane Harbor's recurring theme throughout trial was that Stephens's acts were an independent cause of D.T.'s death.

58

Hurricane Harbor's expert opined that acts of violence at entertainment venues can be random and unpredictable and "that it's entirely possible a criminal disregards the deterrents in place and [that] the crime will be committed irrespective of the procedures." Going on, the expert testified that even if all of Hurricane Harbor's security policies were enforced "to the letter," it was speculation that enforcement of the policies would have prevented Stephens from committing the act that he did.

Elaborating on this assertion, Hurricane Harbor's expert testified as follows (and to this testimony Williams raises no issue that it was inadmissible):

Q. (BY [DEFENSE TRIAL COUNSEL]) -- and are you familiar with the concept of new and independent cause?

A. Yes.

Q. Okay. Do you believe that regardless of -- do you have an opinion whether regardless of the prior conduct of Hurricane Harbor whether Cameron Stephens['s] pulling out a gun and shooting [D.T.] in broad daylight was a new and independent cause?

. . . .

A. Can you repeat the question again?

Q. Yes. I asked you about new and independent cause.

And do you have an opinion whether Cameron Stephens'[s] act of pulling out a gun and shooting [D.T.] in the parking lot, broad daylight, in front of hundred[s] of witnesses, whether that was a new and independent cause?

. . . .

A. It was. He -- he was the cause, the instigator of that particular incident.

59

Hurricane Harbor also offered evidence that not all acts of violence are foreseeable or preventable.

At the charge conference, the parties clashed on whether the concept of new and independent cause was raised by the facts and the law, with Hurricane Harbor's emphasizing to the trial court the evidence that raised the question of whether Stephens's act was a new and independent cause:

THE COURT: What else, [plaintiff's trial counsel]?

[PLAINTIFF'S TRIAL COUNSEL]: The next one is the paragraph that speaks of new and independent cause.

THE COURT: Yeah.

[PLAINTIFF'S TRIAL COUNSEL]: We think that, again, the cases that I read to the [c]ourt earlier. This is the *Coleman Equitable Real Estate Investment* case, but it defines -- it's a 971 S.W.2d 611 at --

THE COURT: Okay.

[PLAINTIFF'S TRIAL COUNSEL]: But this -- this [c]ourt makes clear that there's a -- it distinguishes between a new and independent cause and concurrent act. And it says if the cause could have been foreseen, it doesn't break the causal chain, the chain of causation. So that's the only way it can be new and independent. If the cause could have been foreseen, it's not a new and independent, and that's what this whole case is all about.

We're saying that they could have foreseen Mr. Stephens['s] shooting [of D.T.] by having this unsecured parking lot. We don't think it's a new and independent. We think it would be improper to submit that instruction.

[DEFENSE APPELLATE COUNSEL]: And, Your Honor, we think that there's evidence. So a new and independent cause, it's been pleaded. There's some evidence of whether or not it's foreseeable.

60

[Plaintiff's trial counsel] agrees that an instruction would be proper if the crime is unforeseeable. At the very least, there's a fact issue as to whether or not Mr. Stephens'[s] crime is committed. I mean, we've made arguments to the [c]ourt before [that] we believe that it's not foreseeable. But to the extent there is a fact issue, the evidence in the pleadings support submission of a new and independent cause. Again, it's undisputed --

THE COURT: Right.

[DEFENSE APPELLATE COUNSEL]: -- that Mr. Stephens committed a crime.

[PLAINTIFF'S TRIAL COUNSEL]: These are -- I mean, if that's the case, it would be a new and independent cause in every single premises liability case[,] and it's not. You're not going to see it in -- and if you read all the cases that [defense appellate counsel] was referring to earlier, those that went to a jury, it was not alleged.

Because, again, it was an act that was alleged to be foreseeable, so therefore, there was no instruction about a new and independent cause.

[DEFENSE APPELLATE COUNSEL]: And we have evidence. [Defense expert] Ashwin testified that it's not foreseeable --

THE COURT: Right.

[DEFENSE APPELLATE COUNSEL]: -- at the very least, there's a fact issue.

THE COURT: I'm going to leave that in.

On appeal, Williams again argues that in some way the trial court's submission of Jury Question 1 on the liability of Hurricane Harbor and Six Flags Entertainment Corporation effectively found "that Hurricane Harbor and Six Flages owed a duty to D.T. because the risk of harm was foreseeable[;] it was by definition not a new and independent cause." Specifically, Williams argues that because she alleged that there

61

were failures in Hurricane Harbor's security practices, any criminal act was foreseeable and that a criminal act could not be a new and independent cause:

> The very purpose of imposing a duty on landowners based on past criminal activity in the vicinity is to require that landowner to exercise reasonable care to protect invitees from that foreseeable criminal conduct. The third-party crime is thus the very thing the landowner is charged to act reasonably to prevent. Therefore, the violent criminal activity that occurred here "is the very same risk that render[ed]" Hurricane Harbor and Six Flags negligent, meaning the shooting "cannot serve as a superseding cause." *Dew*[ *v. Crown Derrick Erectors, Inc.*], 208 S.W.3d [448,] 453 [(Tex. 2006)]. Additionally, a criminal act like the shooting here is a hazard that was created or allowed to develop because of Hurricane Harbor's and Six Flags'[s] failure to provide additional security and otherwise exercise ordinary care. The criminal act is not a new and independent cause as a matter of law, and the jury should not have been instructed on the doctrine.

We conclude that the bases of Williams's argument are flawed. First, the trial court did not find that the risk of harm to D.T. was foreseeable; it asked the jury whether the condition of the premises in question caused an unreasonable risk of harm and whether Hurricane Harbor and Six Flags knew of the danger. As we have noted, foreseeability may be a fact question, and here the trial court submitted the question of knowledge underlying foreseeability to the jury as a fact question. *See Pagayon*, 536 S.W.3d at 500, 504.

Further, Williams's argument assumes that it is beyond cavil that Stephens's criminal act was foreseeable—a fact that, as we have noted, Hurricane Harbor challenged throughout the case. We disagree with this proposition of Williams's as well.

New and independent cause has the following general characteristics:

[N]ew and independent cause is the act or omission of a separate and independent agency that destroys the causal connection between the negligent act or omission of the defendant and the injury. New and independent cause is an inferential rebuttal defense that may be submitted to the jury as an instruction. The doctrine is not an affirmative defense; rather, it is one element to be considered by a fact[]finder in determining whether proximate cause exists.

In determining proximate cause, Texas courts distinguish between a new and independent cause and a concurrent act. A concurrent act cooperates with the original act in bringing about the injury and does not cut off the liability of the original actor. A new and independent cause, sometimes referred to as a superseding cause, however, is an act or omission of a separate and independent agency that destroys the causal connection between the negligent act or omission of the defendant and the injury complained of, and thereby becomes the immediate cause of such injury. An intervening cause that is reasonably foreseeable by the defendant, though, is not a new and independent cause that breaks the chain of causation.

*James v. Kloos*, 75 S.W.3d 153, 161 (Tex. App.—Fort Worth 2002, no pet.) (footnotes omitted).

A new and independent cause or, as it may be termed, a superseding cause may arise in the context of a criminal act. As the Fourteenth Court of Appeals explained when dealing with the question of whether a motorist's criminal act of ignoring traffic barriers and plowing through a crowd at an entertainment event was foreseeable,

[c]riminal conduct is often unforeseeable, but for a defendant to negate foreseeability (and therefore the existence of a duty), the defendant must establish more than just the occurrence of criminal conduct. *See Phan Son Van v. Pena*, 990 S.W.2d 751, 754 (Tex. 1999). The defendant must also show that the criminal conduct was not foreseeable because it was an intervening force that rose to the level of a superseding cause. *Id.* The factors to consider in that analysis include[] (1) whether the

intervening force brought about a harm that was different in kind from that which would otherwise have resulted from the defendant's act or omission; (2) whether the intervening force's operation or the consequences thereof appeared after the event to be extraordinary rather than normal in view of the circumstances existing at the time of the force's operation; and (3) whether the intervening force was operating independently of any situation created by the defendant's act or omission, or, on the other hand, whether it was a normal result of such a situation. *Id.*

Based on these legal principles, the Defendants could negate the existence of a duty by conclusively establishing that the Plaintiffs' injuries arose from criminal conduct and that the criminal conduct was not foreseeable. *Id.*

*Nguyen*, 580 S.W.3d at 785. *Nguyen* concluded that evidence from an expert witness— that he had "never heard of an incident of a vehicle driving through or bypassing street-closure barricades and injuring or killing a pedestrian or cyclist on the other side during [the] festival event"—was sufficient to initially establish that "the criminal conduct was an intervening force that was both extraordinary and unforeseeable." *Id.* at 786; *see also Garcia v. El Paso Ltd. P'ship*, 203 S.W.3d 432, 436–37 (Tex. App.—El Paso 2006, no pet.) (applying superseding-cause analysis to question of whether "[t]he targeted, deliberate, and retaliatory nature of the criminal conduct committed by [the person who had committed murder] distinguishes the harm that actually occurred from the kind of harm that one would expect to occur due to [defendant's] alleged negligence [by failing to provide security on its premises]").

Williams does not reference, much less analyze, the standard cited or acknowledge the evidence offered by Hurricane Harbor in its obvious effort to raise

the issue of new and independent cause. It is fair to characterize the testimony that Hurricane Harbor offered as stating that no matter what security measures were in place, those measures would not have deterred Stephens's criminal conduct. In other words, Hurricane Harbor presented a scenario that Stephens's conduct was both extraordinary and operated independently of the situation created by Hurricane Harbor's acts or omissions. We do not pass on the credibility of the testimony. But in view of Williams's refusal to come to grips with the testimony that Hurricane Harbor offered, we cannot conclude that there was no evidence raising the issue of new and independent cause or that the trial court abused its discretion by giving an instruction on that concept. We overrule Williams's third issue.

### 3. The murder instruction was not harmful error.

In her second issue, Williams asserts that it was harmful error for the trial court to instruct the jury that Stephens had been charged with D.T.'s murder and to list the elements of that offense. In her view, this instruction was a comment on the weight of the evidence. In light of the repeated references before the jury that Stephens had been charged with murder, we cannot conclude that the instruction is a cause of such harm that it prompts the retrial of a two-week jury trial.

As we have noted, the construction of the charge falls within the trial court's discretion. *Thota*, 366 S.W.3d at 687. But the charge should not comment on the weight of the evidence. *See* Tex. R. Civ. P. 277 ("The court shall not in its charge comment directly on the weight of the evidence . . . , but the court's charge shall not

65

be objectionable on the ground that it incidentally constitutes a comment on the weight of the evidence . . . .").  The following standard guides the determination of whether an instruction constitutes a comment on the weight of the evidence:

> To constitute a comment on the weight of the evidence, the instruction must indicate the trial court's opinion on the truth of the matter in question.  *Harris v. Gen. Motors Corp.*, 924 S.W.2d 187, 188 n.1 (Tex. App.—San Antonio 1996, writ denied); *see Schack v. Prop. Owners Ass'n of Sunset Bay*, 555 S.W.3d 339, 355 (Tex. App.—Corpus Christi–Edinburg 2018, pet. denied).  An impermissible comment on the weight of the evidence occurs when the judge assumes the truth of a material controverted fact or exaggerates, minimizes, or withdraws some pertinent evidence from the jury's consideration.  *Halmos v. Bombardier Aerospace Corp.*, 314 S.W.3d 606, 617 (Tex. App.—Dallas 2010, no pet.); *see Schack*, 555 S.W.3d at 355.

*Valstay, LLC v. Tex. Windstorm Ins. Ass'n*, No. 13-19-00379-CV, 2021 WL 2371759, at *4 (Tex. App.—Corpus Christi–Edinburg June 10, 2021, pet. denied).

The preliminary instructions in the charge contained a section that read as follows:

ADDITIONAL INSTRUCTIONS

You are instructed that Cameron Stephens has been charged with the crime of murder against [D.T.] on June 23, 2021.

A person commits the crime of murder when the person intentionally or knowingly causes the death of an individual, or intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual, or commits or attempts to commit a felony and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, the person commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

66

At the charge conference, Williams objected to the instruction on the basis that it was "prejudicial, confusing, and [a] comment on the weight of the evidence." The trial court overruled the multi-part objection.

The fact that Stephens had been charged with murder was repeatedly emphasized during trial:

- Hurricane Harbor's opening statement told the jury that Stephens had been arrested for murder and that "[h]e's about five blocks away sitting in a jail cell waiting to be tried for the murder of [D.T.]."

- Arlington's former deputy police chief testified that he had previously reviewed the affidavit supporting the warrant for the murder arrest of Stephens.

- The former deputy chief also testified that a suspect in D.T.'s murder had been identified, arrested, and "charged with murder." The officer testified that Stephens was awaiting trial and identified a picture of Stephens as the "suspect in the murder."

- Hurricane Harbor's counsel had the following exchange with an expert called by Williams:

  > [Q.] You have reviewed records regarding the arrest of Mr. Stephens for the murder of [D.T.]?
  >
  > A. I've reviewed them. They were not really focal for my information.
  >
  > Q. And Mr. Stephens was actually arrested for the murder of [D.T.], correct?
  >
  > A. Yes.
  >
  > Q. And to your knowledge, based upon all of the evidence that's been presented to you, he was the individual

who retrieved the gun and -- and conducted the murder, right?

A. The investigation shows that.

Q. Okay. And so you'd agree with me that the cause of [D.T.]'s death was the conduct of Mr. Stephens?

A. That would [be] an element of the cause, yes.

- Hurricane Harbor's counsel had the following exchange with another expert called by Williams:

    Q. Okay. And you're aware that Cameron Stephens was arrested for the murder of [D.T.]?

    A. That's correct.

    Q. And that he's sitting in a cell about 5 blocks from here waiting to be tried for murder?

    A. I don't know where the jail is.

    Q. All right. Well, you agree that all the evidence in this case supports that [D.T.] took the life -- excuse me, that Mr. Stephens took the life of [D.T.]?

    A. I agree with that.

- The Arlington Police Department homicide detective who "handled the [D.T.] murder case" testified that Stephens was quickly identified as a suspect in the murder. The detective later testified that he had made a determination of probable cause that Stephens had murdered D.T., that he had referred the case to the Tarrant County District Attorney, and that Stephens had been arrested for the murder.

- A redacted copy of the Arlington Police Department report on the murder was admitted into evidence. The report noted Stephens's arrest for murder. Stephens's mug shot was admitted into evidence.

68

In the face of the evidence before the jury that Stephens was charged with murder, Williams argues that the instruction exaggerated Stephens's acts to such an extent that it was harmful. Specifically, Williams argues that "[t]he instruction also told the jury that it should pay particular attention to Stephens'[s] act" and that it "was improper to comment on the murder charge that deflected the jury away from Hurricane Harbor's and Six Flags's role in allowing the crime to happen." Williams further argues,

> [i]n other words, Hurricane Harbor wanted the instruction about murder in the charge so it could argue to the jury that the shooter's conduct was a new and independent cause that precluded liability by Hurricane Harbor. That is exactly why the instruction was improper and should not have been included.

We agree with Williams that the instruction is not without concern in noting Stephens's conduct, but as we have outlined, the fact that Stephens was charged with murder was uncontroverted and repeatedly put before the jury, and no point is raised on appeal that it should not have come before the jury. We also reject Williams's argument that this instruction in some way "deflected" the jury's attention from what Williams contended were the failings in security. Williams was unrelenting in her contentions (1) that the shooting would not have occurred had security measures addressed the possibility of gun crime in the parking lot and (2) that those failings allowed a murder to happen there. We cannot accept that the instruction emphasized Stephens's conduct to the point that we can reasonably conclude that it swayed the jury's answers to the charge. And to the extent that Williams argues that this

69

instruction exacerbated the harm of a wrongful new and independent cause instruction, we have concluded that Williams cannot rely on this bridge because that instruction was properly included in the charge. Thus, even if the murder instruction were given in error, we conclude that it was not so harmful that it probably caused the rendition of an improper judgment. *See* Tex. R. App. P. 44.1(a); *Tex. Mut. Ins. Co. v. Boetsch*, 307 S.W.3d 874, 880 (Tex. App.—Dallas 2010, pet. denied).[19]

### 4. The submission of Stephens's negligence was immaterial and thus was not harmful error.

Also within Williams's second issue, she contends that the trial court erred by submitting a question regarding whether Stephens's conduct was negligent because his "conduct was intentional, [and] so it was error for the trial court to submit a negligence question to the jury." But Williams does not persuade us how the question was material in view of the jury's no-liability finding with respect to Hurricane Harbor and Six Flags Entertainment Corporation or how the question produced harmful error.

---

[19]*Boetsch* applied the following standard to determine if an instruction allegedly commenting on the weight of the evidence was harmful:

> Reversal is required if an improper comment on the weight of the evidence is one that was calculated to cause and probably did cause the rendition of an improper judgment. In making this determination, this [c]ourt must consider the pleadings of the parties, the evidence presented at trial, and the charge in its entirety. Alleged error will be deemed reversible only if, when viewed in the light of the totality of these circumstances, it amounted to such a denial of the rights of the complaining party as was reasonably calculated to cause and probably did cause the rendition of an improper judgment.

307 S.W.3d at 880 (citation omitted).

As we have noted, the jury found that neither the negligence of Hurricane Harbor nor Six Flags Entertainment Corporation was a proximate cause of the occurrence and that Stephens's negligence "proximately cause[d] the occurrence in question" and then apportioned 100% of the responsibility to Stephens and none to Hurricane Harbor or Six Flags Entertainment Corporation. Williams argues that Stephens's conduct could not be "negligent" by citing holdings that a shooting is an intentional act, including *Fulmer v. Rider*, 635 S.W.2d 875, 881 (Tex. App.—Tyler 1982, writ ref'd n.r.e.) (stating that shooting is "a willful and intentional act" and that "appellees [we]re not entitled to recover upon negligence, even though negligence was ple[ade]d and submitted to the jury"). Hurricane Harbor responds that it designated Stephens as a responsible third party based on his negligent conduct, and "[t]he trial court was not required to submit an unrequested intentional tort theory for Stephens because [Appellees] designated him under Chapter 33 and alleged Stephens was negligent." We will not reconcile these clashing positions because we resolve the issue on a different basis.

That different basis arises from Hurricane Harbor's argument that the jury's no-liability finding of its negligence "mooted any relevance of" the question about Stephens's negligence. Though we disagree with Hurricane Harbor's terminology, its basic point is correct. With a finding of no liability for Hurricane Harbor or Six Flags Entertainment Corporation, the question regarding Stephens's conduct was immaterial and had no impact on the judgment.

71

The Fourteenth Court of Appeals recently dealt with a similar issue to the one that we address. *See Ferrera v. Trevino*, No. 14-24-00014-CV, 2025 WL 970423 (Tex. App.—Houston [14th Dist.] Apr. 1, 2025, no pet.). In *Ferrera*, the plaintiff claimed "that the trial court erred in asking the jury to determine whether the negligence of the unknown driver proximately caused the occurrence in question." *Id.* at *2. However, the unknown driver's negligence was submitted in a question asking about the negligence of all the defendants to which the jury answered "no" as to each. *Id.*

*Ferrera* initially noted the harmful error rule—Texas Rule of Appellate Procedure 44.1(a)—and that appellants had asserted "that the trial court's error in asking the jury to determine whether the negligence of the unknown driver proximately caused the occurrence in question 'confused the jury and was reasonably calculated to cause the rendition of an improper verdict.'" *Id.* *Ferrera* stated the standard that it would apply to answer the appellants' challenge:

> Submission of an improper jury question can be harmless error if the jury's answers to other questions render the improper question immaterial. *City of Brownsville* . . . , 897 S.W.2d [at] 752 . . . . A jury question is considered immaterial when its answer can be found elsewhere in the verdict or when its answer cannot alter the effect of the verdict. *Id.* Submission of an immaterial issue is not harmful error unless the submission confused or misled the jury. *Id.* When determining whether a particular question could have confused or misled the jury, we "consider its probable effect on the minds of the jury in the light of the charge as a whole." *Id.* (quoting *Tex*[.] *Emp*[s.] *Ins. Ass'n v. McKay*, 210 S.W.2d 147, 149 ([Tex.] 1948)).

*Id.*

72

Applying the principle that a jury's answer to other questions may render a challenged question immaterial, *Ferrera* concluded that the jury's "no" answer on any of the defendants' liability rendered the liability of the unknown driver immaterial:

> The proper interpretation of the jury's answers is that the jury found that the trial evidence did not prove by a preponderance of the evidence that the negligence of [the defendant, the injured party, and the unknown driver] proximately caused the occurrence in question. *See Energy Maint[.] Servs. Gr[p.] I v. Sandt*, 401 S.W.3d 204, 213 (Tex. App.— Houston [14th Dist.] 2012, pet. denied). The jury's answer to the question regarding [the unknown driver] was immaterial in light of the jury's "no" answer to the question of whether [the defendant's] negligence proximately caused the occurrence in question. *See City of Brownsville*, 897 S.W.2d at 752. Once the jury found that the trial evidence did not prove by a preponderance of the evidence that [the defendant's] negligence proximately caused the occurrence in question, [the defendant] was exonerated of liability, and neither an affirmative nor a negative answer to the question regarding [the unknown driver's] negligence could have altered the verdict. *See id.* Reading the charge as a whole, we do not find that any of the questions submitted were ambiguous or misleading. *See id.* Though the [injured parties] objected to the submission of the unknown driver's negligence, they did not object to the specific wording of Question 1 or any instruction relevant to Question 1. *See id.* at 752–53. After reviewing the record, we conclude that the trial court's presumed error in granting [the defendant's] motion for leave to designate the unknown driver as a responsible third party and in asking the jury to determine whether the negligence of [the unknown driver] proximately caused the occurrence in question is not reversible because this error (1) did not probably cause the rendition of an improper judgment; and (2) did not probably prevent the [injured parties] from properly presenting the case to this court. *See* Tex. R. App. P. 44.1(a); *City of Brownsville*, 897 S.W.2d at 752–53 (concluding that submission of a question as to whether decedent's conduct proximately caused his own death was not reversible error); *Hernandez v. Atieh*, No. 14-06-00582-CV, 2008 WL 2133193, at *3–4 (Tex. App.—Houston [14th Dist.] May 20, 2008, no pet.) (holding that any error in submitting the negligence of a responsible third party was not reversible error whe[n] the jury found that the evidence did not prove by a preponderance of evidence that the defendant's negligence

proximately caused the accident) . . . ; *Sell v. C.B. Smith Volkswagen, Inc.*, 611 S.W.2d 897, 903 (Tex. . . . App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.) (holding that any error in asking the jury questions about the plaintiffs' alleged contributory negligence was not reversible error because the jury did not find that the defendants were negligent).

*Id.*

Here, Williams tries to undermine the jury's no-liability finding by launching two attacks on the charge that impact the liability question, which are based on the murder instruction and the instruction on new and independent cause. Williams argues that those errors must have had some impact on the jury's overall findings:

> These errors were harmful because this improper comment permeated the elements of proof for both the plaintiff and the defendants – the comment on the evidence was relevant to at least foreseeability, proportionate responsibility, new and independent cause, and proximate cause. The instructions also directly contradicted the submission of a negligence instruction relating to Stephens's conduct. The negligence question in particular allowed [the] jury to impose a lower standard of culpability on Stephens, which may have altered the jury's findings against Hurricane Harbor and Six Flags.[20]

---

[20]Williams carries forward the same basic harm argument in her reply brief:

Interestingly, Hurricane Harbor's appellate argument highlights how the charge error was harmful. Hurricane Harbor organized its brief to argue that the new and independent cause instructions were proper (they were not), and it then used the new and independent cause instruction to claim that instructing the jury about the elements of murder was also appropriate. In other words, Hurricane Harbor wanted the instruction about murder in the charge so it could argue to the jury that the shooter's conduct was a new and independent cause that precluded liability by Hurricane Harbor. That is exactly why the instruction was improper and should not have been included. The trial court abused its discretion by submitting a negligence question for Stephens's intentional

74

We have rejected the challenges that Williams raised to both the murder instruction and to the new and independent cause instruction. Williams's only specific mention of the broader impact of the negligence question is that it "*may* have altered the jury's findings against Hurricane Harbor and Six Flags." [Emphasis added.] She does not explain how that "may" have occurred and offers nothing more than conclusory challenges to the effect of the negligence question. At bottom, Williams makes no viable challenge to the liability question that the trial court submitted and the jury answered in the negative, and without such, the answer to that question rendered the answer to the question about Stephens's negligence immaterial. With that foundation in place, whether the trial court erred in submitting a theory of liability as to Stephens becomes immaterial, and as *Ferrera* explained, such error—if it was error—was harmless.

We overrule Williams's second issue.

### C. The trial court did not err by excluding evidence of gross negligence.

In her fourth issue, Williams contends that the trial court should have allowed her to present evidence on the question of gross negligence as support for a claim of exemplary damages. She makes this contention despite the following:

- She failed to plead the standard necessary to obtain such a recovery;

- She proposed no jury issue that would support such a recovery;

conduct and instructing the jury on the elements of murder. [Brief reference omitted.]

75

- She failed to explain how the evidence that she sought to introduce was probative enough on the question that the trial court abused its discretion by excluding it; and

- She failed to preserve error or to correlate the evidence that she sought to the standards that would support the gross-negligence theory upon which she based her claim.

### 1. We set forth the standards for the recovery of exemplary damages when harm results from a criminal act.

The Civil Practice and Remedies Code limits a plaintiff's ability to recover exemplary damages for "harm resulting from a criminal act." Tex. Civ. Prac. & Rem. Code § 41.005. Section 41.005 states a general rule and then provides an exception to that rule. The general rule is that "[i]n an action arising from harm resulting from an assault, theft, or other criminal act, a court may not award exemplary damages against a defendant because of the criminal act of another." *Id.* § 41.005(a). In turn, the exception that Williams claims is applicable states that

> [t]he exemption provided by Subsection (a) does not apply if . . . the criminal act occurred at a location where, at the time of the criminal act, the defendant was maintaining a common nuisance under the provisions of Chapter 125, Civil Practice and Remedies Code, and had not made reasonable attempts to abate the nuisance.

*Id.* § 41.005(b)(3).

A common nuisance under Chapter 125 is defined through certain activities that a person permits to occur and does not act reasonably to abate: "A person who maintains a place to which persons habitually go for the following purposes and who knowingly tolerates the activity and furthermore fails to make reasonable attempts to

76

abate the activity maintains a common nuisance[.]" *Id.* § 125.0015; *see also id.* § 125.001(1) ("In this chapter . . . '[c]ommon nuisance' is a nuisance described by Section 125.0015."). The prohibited purposes for which a property is maintained, and which cause it to be a common nuisance, are enumerated by twenty-eight criminal acts set out in the statute defining a common nuisance. *Id.* § 125.0015(a)(1)–(28).

Then, the Civil Practice and Remedies Code outlines what proof may be used to establish the existence of a common nuisance, with such proof targeting whether the activity frequently occurred at the place where the common nuisance is alleged to exist: "Proof that an activity described by Section 125.0015 is frequently committed at the place involved or that the place is frequently used for an activity described by Section 125.0015 is prima facie evidence that the defendant knowingly tolerated the activity." *Id.* § 125.004(a).

### 2. Williams failed to plead the basis for a recovery of exemplary damages that she now invokes.

Though Williams admitted both in her petition and in her brief that D.T.'s death was caused by a criminal act, her live pleading makes no mention of the nuisance exception that she now invokes. Instead, she argues that her pleading of a conventional gross-negligence claim and her proposed submission of a conventional gross-negligence issue was close enough to warrant the admission of her gross-negligence evidence. We disagree. Williams simply ignored the effect of Section

77

41.005—though it was pleaded by Hurricane Harbor—and wants us to ignore that failing as well, which we will not do.

Williams's live pleading noted that D.T. was killed when Stephens shot him. Further, Williams's briefing turns on the assumption that Section 41.005 applies to her claims but that she has brought herself within its ambit by her pleading and proposed issue submission. Unquestionably, Williams was seeking to recover for harm resulting from a criminal act.

Nor is there a controversy on the impact of Section 41.005 on Williams's claim even though she asserted that the act resulted from Hurricane Harbor's concurrent negligence. The Fourteenth Court of Appeals recently marshalled the authority that Section 41.005 generally bars a claim of exemplary damages when a defendant's negligence occurs concurrently with a criminal act:

> Section 41.005 bars exemplary damages for negligence occurring concurrently with a criminal act. *See, e.g.*, *Healthcare Ctrs. of Tex., Inc. v. Rigby*, 97 S.W.3d 610, 620 (Tex. App.—Houston [14th Dist.] 2002, pet[s]. denied) [(op. on reh'g)] (concluding that the defendant's conduct of allowing a resident—who the defendant knew was a sexual threat to others—to remain at the defendant's nursing home exposed another resident to the danger of sexual assault that resulted in harm to the other resident by sexual assault), *overruled on other grounds by Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842 (Tex. 2005); *see also, e.g.*, *Miles v. Jerry Kidd Oil Co.*, 363 S.W.3d 823, 826 (Tex. App.—Tyler 2012, no pet.) (concluding that the defendant's conduct of not having enough change in the store exposed its employee to the danger of walking across a busy roadway to obtain change, which resulted in harm to the employee by being struck and killed by a drunk driver); *Jung v. 24 Hour Fitness USA, Inc.*, No. 4:17-CV-787, 2019 WL 3037537, at *5 (E.D. Tex. July 11, 2019) (mem. op. & order) (concluding that defendant's employees' conduct (cutting plaintiff's lock) exposed plaintiff to danger (potential theft) that

78

resulted in the harm plaintiff suffered and recovered for at trial (the theft of her property from the locker)); *Bhatti v. Concepts Am., Inc.*, No. 3:14-CV-3445-L, 2016 WL 3880747, at *2, [*]16 (N.D. Tex. July 18, 2016) (mem. op. & order) (concluding that the defendant's conduct (serving alcohol to a patron who was increasingly aggressive toward the plaintiff) exposed the plaintiff to danger (a fight) that resulted in harm to the plaintiff (the patron caused injury by throwing a glass at the plaintiff)).

*Massage Heights Franchising, LLC v. Hagman*, 679 S.W.3d 298, 309 (Tex. App.—Houston [14th Dist.] 2023), *rev'd on other grounds*, 712 S.W.3d 615, 620–23 (Tex. 2025). Further, courts read Section 41.005(b)'s exceptions to include only those enumerated exceptions and no others. *See Miles*, 363 S.W.3d at 826 (noting that concurrent cause is not an exception to an award of exemplary damages under the plain language of Section 41.005(b)'s four exceptions).

Williams does not claim that she pleaded the nuisance exception in Section 41.005(b)(3) that she now relies on. Her argument is that her pleading of the conventional principles of gross negligence stood in the stead of the nuisance claim:

> [Williams's] live pleading alleged that Hurricane Harbor and Six Flags failed to make reasonable attempts to abate the acts taking place despite repeated violations and recommendations. In addition, the pleading included six paragraphs covering three pages seeking exemplary damages and setting out Hurricane Harbor's and Six Flags's conduct that justified exemplary damages. Specifically, the petition alleged as bases for exemplary damages that Hurricane Harbor and Six Flags failed to provide adequate supervision, monitoring[,] and patrolling of the premises; failed to have adequate security coverage or functioning security cameras during the incident in question; failed to eliminate or mitigate a dangerous condition on their premises, especially in light of violent crimes and other crimes against persons occurring at or near Hurricane Harbor and Six Flags Over Texas, despite knowledge that their parking lots are soft targets for crime, that the surrounding areas had significant criminal activity, and that dangerous individuals might

79

come upon or even frequent the property due to pervasive criminal activity in the area. [Record references omitted.]

Because no special exception was filed to these allegations, Williams argues that the pleading "sufficiently mirrors [S]ection 125.0015 of the [C]ivil [P]ractice and [R]emedies [C]ode to have pleaded common nuisance as a basis to recover exemplary damages." Without saying so, Williams is arguing that a concurrent cause of D.T.'s death was the allegedly gross negligence of Hurricane Harbor and that enabled her to recover exemplary damages.

The allegations that her petition made were based on the general principles of gross negligence as that concept is defined in the Civil Practice and Remedies Code:

"Gross negligence" means an act or omission:

(A) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

(B) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

Tex. Civ. Prac. & Rem. Code § 41.001(11). The petition's allegations were an attempt to invoke not Section 41.005 but Section 41.003(a) of the Civil Practice and Remedies Code that provides the general standards for the recovery of exemplary damages as follows: "[E]xemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from . . . gross negligence." *Id.* § 41.003(a)(3).

Nothing in the petition gave notice that it was an attempt to invoke the exception in Section 41.005. We disagree that Williams may simply conflate the normal standards for gross negligence and then attempt to shoehorn those into an exception specified in Section 41.005. Without even a mention of the exception, we fail to see how her petition provides fair notice that she is invoking the nuisance exception found in Section 41.005(b)(3) or asserting that a common nuisance existed under Section 125.0015. *See* Tex. R. Civ. P. 47(a) (stating that a petition shall contain "a short statement of the cause of action sufficient to give fair notice of the claim involved").

Though not in a pleading context, other courts have not allowed the principle of transference that Williams invokes to allow a finding under the standards of gross negligence to support a recovery under an exception specified in Section 41.005. For example, the Fourteenth Court of Appeals dealt with whether findings of malice would support an award of exemplary damages in a case involving the criminal act of the "attempted" sexual assault of a nursing-home patient. *Rigby*, 97 S.W.3d at 619. In *Rigby*, a plaintiff had obtained an affirmative finding that the defendant had acted with malice and argued that such a finding supported recovery of exemplary damages under a Section 41.005 exception, a contention that *Rigby* rejected:

> In responding affirmatively to jury question number six, the jury concluded that the harm to plaintiffs resulted from "malice" of Healthcare, by and through its "vice principal." The jury awarded $50,000,000 as exemplary damages in response to question number eight. Assessment of damages in question number eight was "for the

81

conduct found in response to question number six." Question number six was posited such that the jury could not distinguish between the criminal act of [another patient] and malice attributed to Healthcare. Appellee contends the jury assessed punitive damages because of Healthcare's malice, not because of the criminal act of another. In interpreting or applying [Section] 41.005 to any scenario, it seems implicit that our legislature anticipated [that] a jury might find a defendant acted with malice even though the harm to a plaintiff was caused by the criminal act of another. Because the plaintiff admitted her harm was caused by the criminal conduct of [another patient], she is barred from recovering exemplary damages under [S]ection 41.005 despite the jury's finding that Healthcare acted with malice. The affirmative finding of malice against Healthcare does not super[s]ede the effect of appellant's judicial admission that [the injured patient's] harm was caused when she was assaulted by [another patient]. *See Chilton Ins.*[ *Co. v. Pate & Pate Enters., Inc.*], 930 S.W.2d [877,] 884–[]86[ (Tex. App.—San Antonio 1996, writ denied)]; *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 905 (Tex. 2000).

*Id.* at 619–20 (footnotes omitted); *see also Massage Heights*, 679 S.W.3d at 310 (concluding that when an injury is alleged to be a concurrent act between the negligence of defendant and the criminal act, a finding of gross negligence did not overcome bar of Section 41.005).

In essence, Williams alleged that Hurricane Harbor's security measures were not reasonable and that the crimes that she sought to introduce made the occurrence in question foreseeable, but she never pleaded that Hurricane Harbor had "knowingly tolerate[d] the activity and furthermore [had] fail[ed] to make reasonable attempts to abate the activity [thus] maintain[ing] a common nuisance." Tex. Civ. Prac. & Rem. Code § 125.0015. Because the standards sound similar, Williams wants us to ignore the distinction imposed by the Texas Legislature in the Civil Practice and Remedies

82

Code and the fact that Hurricane Harbor was deprived of the ability to prepare for trial knowing that it would have to orient its proof to the question of whether its activities were reasonable but that they also constituted a nuisance under the standards of Civil Practice and Remedies Code Section 125.0015. *See First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 224-25 (Tex. 2017) ("[T]he fair-notice standard measures whether the pleadings have provided the opposing party sufficient information to enable that party to prepare a defense or a response."). She never acknowledges that this left Hurricane Harbor in the dark about the standard that would govern its actions. Nor does Williams ever attempt to explain why when faced with Hurricane Harbor's pleading of Section 41.005, she did not take the simple step of pleading that section's exceptions. Instead, she stood on a pleading of gross negligence—an act that we read *Rigby* and *Massage Heights* as holding to be insufficient to support a recovery under the exceptions of Section 41.005.

### 3. Williams failed to submit a proposed jury question on the common-nuisance exception that she now invokes.

Williams also never proposed a jury question for the proposition that Hurricane Harbor maintained a common nuisance. Hurricane Harbor relies on this failure to argue that Williams waived her claim because she did not request submission of an issue on that question or object to the failure to include such a question at the charge conference. Williams responds that Hurricane Harbor wanted her to go through a futile exercise and that she is excused from the seemingly obvious

obligation to propose a question on the theory that she now relies on. She argues that there was no need for the exercise of submitting a proposed question when the trial court had already granted a motion in limine on the issue of gross negligence and that she preserved the issue of that ruling by her offer of proof. In passing, she also claims that she "requested a gross-negligence question in Plaintiffs' Proposed Charge of the Court [that] would only be proper under Tex. Civ. Prac. & Rem. Code [C]hapter 125." [Record reference omitted.] The failing of Williams's argument is that she never requested a substantially correct issue for the theory of recovery that she now invokes, including in the proposed charge that she submitted before the trial court's rulings on the motion in limine. The question that she mentioned as being submitted in her proposed charge does not support a recovery under the exception that she now relies on. She fails to convince us that she is excused from so fundamental a requirement as requesting an issue on the predicate fact question that would support her recovery.

The jury question that Williams proposed was a standard submission of gross negligence under Section 41.003(a)(3). *See* Tex. Civ. Prac. & Rem. Code § 41.003(a)(3).[21] The question submitted was not on the factual issues underlying a

---

[21]The proposed question was as follows:

Do you find by clear and convincing evidence that the harm to [D.T.] resulted from gross negligence attributable to one or more of the Defendants?

common nuisance under Chapter 125.  Williams does not challenge that she bore the

burden of proof on that question.  *See id.* § 41.003(c) ("If the claimant relies on a

statute establishing a cause of action and authorizing exemplary damages in specified

circumstances . . . , exemplary damages may be awarded only if the claimant proves by

clear and convincing evidence that the damages result[ed] from the specified

circumstances . . . .").  And she turns a blind eye to her obligation to request at some

point an issue supporting her recovery in a substantially correct form.  *See* Tex. R. Civ.

P. 278 ("Failure to submit a question shall not be deemed a ground for reversal of the

---

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

"Gross negligence" means an act or omission by any Defendant,

1. which when viewed objectively from the standpoint of Defendant at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

2. of which Defendant has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

**Answer "Yes" or "No" for each of the following:**

1. Hurricane Harbor, LP[]              _____

2. Hurricane Harbor, GP, LLC[]         _____

3. Six Flags Theme Parks, Inc.         _____

4. Six Flags Entertainment Corporation  _____

85

judgment, unless its submission, in substantially correct wording, has been requested in writing and tendered by the party complaining of the judgment.").

Indeed, when the trial court inquired about whether Williams had made a requested submission during her offer of proof, Williams's counsel stated that she had submitted no proposed issue on the question of nuisance under Chapter 125 because she was "not pleading it as a cause of action." Again, we read *Rigby* and *Massage Heights* as holding that a submission under the general principles of Section 41.003(a) is not a submission of the nuisance exception under Chapter 125. Further, the proposed charge was submitted before trial began, which undermines her contention that the trial court's ruling on the motion in limine made her charge request a futile act. We reject Williams's attempt to avoid her failure to submit a substantially correct question.

4. **Williams fails to establish that the trial court abused its discretion by excluding the specific exhibits that she wanted to introduce to prove her claim for exemplary damages.**

Next, we turn to the specific evidence that Williams sought to offer. Our task in this regard is complicated by Williams's shifting position on appeal and her characterization of the exhibits offered. The upshot of this analysis is that Williams fails to convince us that the trial court abused its discretion by excluding her exhibits, even if we ignore her failure to assert a Chapter 125 claim as we have already outlined.

We first deal with the exhibits that were referenced in Williams's opening brief and that were referenced during her offer of proof as being "items of foreseeability,

86

gross negligence, and public nuisance." Williams's brief offers the following description of the majority of the exhibits that she offered:

> Exhibits 310 and 312 were heightened security plans [that] Six Flags implemented at certain times, and they were relevant and admissible to show that Hurricane Harbor and Six Flags (who shared the same security management) had plans for and the capability of offering extra security when desired. Exhibit 313 was an April 21, 2021 Risk, Threat & Vulnerability Assessment Report for Six Flags[,] which showed the knowledge of potential security threats but also suggested courses of action to alleviate threats, thus making it relevant to foreseeability, knowledge, and the reasonableness of Hurricane Harbor's and Six Flags's security efforts on the day of this incident. Exhibit 318 was a similar 2021 report for other Six Flags and Hurricane Harbor [P]arks and was relevant for the same reasons.[22] [Record references omitted.]

In this excerpt, Williams obliquely acknowledges that the cataloged exhibits involved properties other than Hurricane Harbor or the Arlington Six Flags. But she does not explain why it was outside the trial court's discretion to conclude that documents referencing other parks were not admissible to show that Hurricane Harbor in Arlington was maintained as a common nuisance when defined as "a place to which persons habitually go" for the purposes listed in Chapter 125 and who "knowingly tolerate[] the activity and furthermore fail[] to make reasonable attempts to abate the activity." Indeed, during the offer of proof, Hurricane Harbor made this very point and asserted a number of objections to the exhibits, none of which Williams addressed. The disparity was also the trial court's stated basis for excluding the documents—a fact that she does not mention in her brief. Thus, Williams has failed

---

[22]Williams's reply brief also references Plaintiff's Exhibits 82, 83, and 84, which are not indexed in the reporter's record.

to make an attempt at establishing that the trial court's basis for the exclusion of the exhibits was error. *See Indep. Specialty Ins. Co. v. Blossoms Montessori Sch. Inc.*, No. 01-23-00840-CV, 2025 WL 1583577, at *2 (Tex. App.—Houston [1st Dist.] June 5, 2025, pet. denied) (explaining that when an appellant fails to attack an independent ground that, if meritorious, would fully support the trial court's ruling, then (1) we accept the unchallenged independent ground as fully supporting the trial court's ruling, and (2) any error in the ground challenged on appeal is harmless because the unchallenged independent ground fully supports the ruling).

Williams references two exhibits other than those specifically dealing with other parks. The first is Exhibit 304 that makes a general reference that Park security should have been aware that items that appeared to be candy have prohibited THC levels and that there is a concern that children could unknowingly consume these items. Again, Williams does not explain how a document that does not specifically mention Hurricane Harbor in Arlington and that directs security to be proactive in the detection of the items is probative that criminal activity was tolerated at Hurricane Harbor and that reasonable steps were not being taken to abate those activities. Nor, again, does Williams address the objections that Hurricane Harbor's counsel made to the exhibit.

The remaining exhibit, Plaintiff's Exhibit 322, references the Arlington properties and is a compilation of few incidents of simple assault, disorderly conduct, and trespass. These incidents occurred over a two-year period from July 2019 until

June 2021. Williams's brief makes no effort to note that each of these incidents is an activity listed in Chapter 125. *See* Tex. Civ. Prac. & Rem. Code § 125.0015(a)(1)–(28). Nor does she explain how the occurrence of these incidents in a two-year period was some evidence that Hurricane Harbor was tolerating a nuisance.

In her reply brief, Williams switches gears and makes only a passing reference to the exhibits that we have just discussed. Her argument morphs into one that the trial court should have admitted the specific exhibit that showed crimes on the premises of Hurricane Harbor and Six Flags:

> Hurricane Harbor also incorrectly claims that no relevant § 125.0015 nuisance evidence was excluded. The record plainly shows otherwise. [Williams's] exhibits 86 through 121 detail numerous criminal incidents occurring on the premises—including assaults, aggravated assaults, sexual assaults, robberies, and other offenses—reported directly to law enforcement. These reports were offered in part to establish the pattern of common-nuisance crimes and the property owner's notice of them. Yet none were admitted.

Williams's brief does not reference where these exhibits were offered or mentioned during her offer of proof on the issue of what should have been admitted on the question of gross negligence and exemplary damages, and the record demonstrates that they were not offered or admitted. *See Akukoro v. Akukoro*, No. 01-12-01072-CV, 2013 WL 6729661, at *6 (Tex. App.—Houston [1st Dist.] Dec. 19, 2013, no pet.) ("Failure to demonstrate the substance of the excluded evidence through an offer of proof or bill of exception results in waiver of any error in its exclusion.").

Further, the referenced exhibits consume more than 400 pages of the record. Williams's summary argument leaves it to us to correlate the exhibits to the categories of crimes listed in Section 125.0015(a)(1)–(28), a burden that we will not undertake. *See In re Marriage of Peralta & Garcia*, No. 05-23-00217-CV, 2025 WL 251339, at *1 n.1 (Tex. App.—Dallas Jan. 21, 2025, no pet.) (noting that it is not the appellate court's duty to search the record for evidence supporting an appellant's arguments); *Barnett v. Coppell N. Tex. Ct., Ltd.*, 123 S.W.3d 804, 817 (Tex. App.—Dallas 2003, pet. denied) ("An appellate court has no duty to search a voluminous record without sufficient guidance from an appellant to determine whether an assertion of reversible error is valid.").[23]

Accordingly, we overrule Williams's fourth issue.

## IV. Conclusion

We have carefully reviewed the claims of error raised by Williams in her four issues and have detailed why we have overruled them. Accordingly, we affirm the trial court's judgment.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: May 21, 2026

---

[23]We do not reach Hurricane Harbor's argument that evidence on gross negligence is inadmissible because Williams "no longer purport[ed] to represent the estate of D.T." *See* Tex. R. App. P. 47.1.